2001 OK CR 17

**Jervaughn Warren MILLER, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. D–99–33.**

Court of Criminal Appeals of Oklahoma.

June 20, 2001.

As Corrected Aug. 17, 2001.

An Appeal from the District Court of Comanche County, the Honorable Allen McCall, District Judge.

Steven Hess, Larry Tedder, Oklahoma Indigent Defense System, Norman, OK, Counsel for Appellant at trial.

Fred Smith, 1st Assistant District Attorney, Comanche County Courthouse, Lawton, OK, Counsel for the State at trial.

Julie L. Gardner, Timothy J. Gifford, Oklahoma Indigent Defense System, Norman, OK, Counsel for Appellant on appeal.

W.A. Drew Edmondson, Attorney General Of Oklahoma, Jennifer B. Miller, Assistant Attorney General, Oklahoma City, OK, Counsel for the State on appeal.

Mark Henricksen, Henricksen & Henricksen Lawyers, Inc., El Reno, for Appellant on appeal.

## OPINION

LUMPKIN, Presiding Judge:

¶ 1 Appellant, Jervaughn Warren Miller, was tried by jury in the District Court of Comanche County, Case No. CRF–97–456, and convicted of First Degree Murder (Count I), in violation of 21 O.S.1991, § 701.7(A), and Assault and Battery with a Deadly Weapon, after former conviction of a felony (Count II), in violation of 21 O.S.Supp. 1992, § 652. Following second stage proceedings, the jury found the existence of three aggravating circumstances: (1) that Miller is a continuing threat to society; (2) that Miller was previously convicted of a felony involving the use or threat of violence; and (3) that Miller knowingly created a great risk of death to more than one person. The jury set punishment at death with respect to Count I and life imprisonment with respect to Count II. The trial judge sentenced Appellant accordingly. Appellant now appeals his convictions and sentences.[1]

¶ 2 An extensive review of the facts is unnecessary, as we find this case must be reversed and remanded to the district court for a new trial consistent with this opinion. However, a brief review of the facts may be beneficial.

¶ 3 The evidence at trial shows that on December 9, 1997, Appellant shot Timothy Rucker and Kenneth McKinney outside the front door of a Lawton apartment. Rucker died eleven days later. McKinney survived.

¶ 4 The shootings were linked to two separate confrontations that occurred that day. The first confrontation was between a group of young men, including Appellant's younger brother Hardy, and Rucker. The men had come to the apartment looking for "Joyce," who was not there, and Rucker sent them away. Feeling Rucker had "disrespected" them, Hardy reported the incident to Appellant. Appellant, Hardy, and many others then returned to the apartment to confront Rucker. Rucker and McKinney emerged from the apartment. An argument erupted, the details and severity of which were some-

1. Appellant's Petition in Error was filed in this Court on July 2, 1999. His initial brief was filed on December 28, 1999. The State's brief was filed on April 25, 2000, and Appellant's reply brief was filed on May 15, 2000. The case was submitted to this Court on May 1, 2000, and oral argument was held on August 29, 2000. Along with his initial brief, Appellant filed an application for evidentiary hearing on Sixth Amendment claims appearing outside of the record, pursuant to Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (1999). Finding Appellant's application and supporting affidavits had sufficiently rebutted the strong presumption of regularity of the trial pro-
ceedings and competency of trial counsel and contained sufficient information to show the Court by clear and convincing evidence that there is a strong possibility trial counsel was ineffective, this Court remanded the case to the District Court of Comanche County. A three day evidentiary hearing was held in November of 2000, and the trial court filed findings of fact and conclusions of law on January 8, 2001. Appellant filed a Supplemental Brief following evidentiary hearing on January 23, 2001, and the State filed its own briefs with respect to the evidentiary hearing on January 23, 2001 and February 12, 2001.

what in dispute. At some point, Appellant pulled out a gun and shot Rucker. He then shot McKinney in the back as McKinney was attempting to return to the apartment.

¶ 5 Appellant raises fourteen separate legal issues in this appeal. We will only discuss those necessary to explain our decision and those that may be beneficial to the district court during the course of Appellant's new trial, upon remand.

¶ 6 In his second proposition of error, Appellant claims the trial court erred by failing to suppress a statement Appellant gave to police officers on January 13, 1998. Appellant alleges this action violated his right to counsel under the Sixth Amendment and to due process under the Fifth and Fourteenth Amendments to the U.S. Constitution and Article II, § 7 of the Oklahoma Constitution.

¶ 7 Appellant was arrested on December 24, 1997 and arraigned two days later. At arraignment, he was informed of the charge and advised of his rights, and he entered a plea of not guilty. There is no indication he requested counsel until February 27, 1998, when Appellant completed a pauper's affidavit for appointed counsel.[2] Counsel was then appointed after a March 2, 1998 hearing.

■ ¶ 8 Between the time of his arraignment and Appellant's request for counsel, police detectives initiated an interview with Appellant in the Comanche County jail. After being advised of his *Miranda*[3] rights, Appellant signed a waiver and spoke to the detectives. During the interview, Appellant claimed he was not present during the shooting, although there was overwhelming evidence that he was. This statement was admitted into evidence, despite objection from trial counsel by way of a pretrial motion to suppress.

■ ¶ 9 The Sixth Amendment right to counsel attaches at arraignment, and a defendant has a right to counsel at any post-arraignment questioning. *Pickens v. State*, 1994 OK CR 74, ¶ 5, 885 P.2d 678, 681, *reversed in part on other grounds, Parker v.*

*State*, 1996 OK CR 19, 917 P.2d 980; *see also Battenfield v. State*, 1991 OK CR 82, ¶ 17, 816 P.2d 555, 561 ("The right to counsel under the Sixth Amendment extends to post arraignment interrogations.") The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State. *Michigan v. Jackson*, 475 U.S. 625, 632, 106 S.Ct. 1404, 1408, 89 L.Ed.2d 631 (1986).

■ ¶ 10 After a formal accusation has been made—and a person who had previously been just a "suspect" has become an "accused" within the meaning of the Sixth Amendment—the constitutional right to the assistance of counsel is of such importance that the police may no longer employ techniques for eliciting information from an uncounseled defendant that might have been entirely proper at an earlier stage of their investigation. *Michigan v. Jackson*, 475 U.S. at 633, 106 S.Ct. at 1409. Thus, if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid. *Id.*, 475 U.S. at 636, 106 S.Ct. at 1411.

¶ 11 Although Appellant was confined in the county jail at the time of interrogation, the State claims his statement was admissible because Appellant had not requested counsel at the time his statement was given and he executed a waiver of his right to counsel. Thus, the State claims this situation is similar to *Willingham v. State*, 1997 OK CR 62, 947 P.2d 1074, *reversed on other grounds, Shrum v. State*, 1999 OK CR 41, 991 P.2d 1032, which distinguished *Pickens* and *Michigan v. Jackson* on the basis that the defendant "did not ask for counsel until after this statement had been made." *Willingham*, 1997 OK CR 62, ¶ 12, 947 P.2d at 1079. We find *Willingham* somewhat distinguishable on this point, and therefore rely upon *Patterson v. Illinois*, 487 U.S. 285, 108

---

2. Appellant's counsel argues there is circumstantial evidence that suggests Appellant invoked his right to counsel at arraignment. We find no support for this statement in the record.

3. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

S.Ct. 2389, 101 L.Ed.2d 261 (1988), which sufficiently resolves the issue at hand.

¶ 12 In *Patterson,* the Supreme Court explained that its decision in *Michigan v. Jackson* "turned on the fact that the accused 'ha[d] asked for the help of a lawyer' in dealing with the police." *Patterson,* 487 U.S. at 291, 108 S.Ct. at 2394, *quoting Michigan v. Jackson, supra,* 475 U.S. at 631, 633–635, 106 S.Ct. at 1409–1411. The Court then stated:

> [T]he key inquiry in a case such as this one must be: Was the accused, who waived his Sixth Amendment rights during post indictment questioning, made sufficiently aware of his right to have counsel present during the questioning, and of the possible consequences of a decision to forgo the aid of counsel? In this case, we are convinced that by admonishing petitioner with the *Miranda* warnings, respondent has met this burden and that petitioner's waiver of his right to counsel at the questioning was valid....
>
> ....
>
> ... As a general matter, then, an accused who is admonished with the warnings prescribed by this Court in *Miranda,* 384 U.S., at 479, 86 S.Ct., at 1630, has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one.

*Patterson,* 487 U.S. at 292–93, 296, 108 S.Ct. at 2395, 2397.

¶ 13 The same is true here. Although Appellant's Sixth Amendment right to counsel had attached, he had not requested assistance of counsel at the time he spoke with officers. He then waived his Sixth Amendment right when officers gave him the *Miranda* warning and he executed a written waiver. Thus, the trial court did not err in refusing to suppress Appellant's statement.

¶ 14 In his sixth proposition of error, Appellant claims his rights under the Sixth and Fourteenth Amendments to the U.S.

Constitution and under Article II, §§ 7, 9, and 20 of Oklahoma's Constitution were violated when the trial court dismissed Juror Murphy on the third day of trial. Appellant claims the trial court abused its discretion by discharging Juror Murphy without good cause and by meeting with her *in camera,* without the presence of Appellant or his counsel. He claims this was a denial of his right to counsel and his right to be present during all critical stages of the proceedings.

¶ 15 At the time of her dismissal, Juror Murphy had already participated in convicting Appellant of first degree murder and had heard a full day of sentencing stage evidence. It appears Ms. Murphy became upset upon hearing the emotional testimony of Appellant's older brother, Lamont Miller, who testified about Appellant being "scarred for life" by abuse and about the stress Lamont and his family were experiencing because of the trial. Minutes after Miller's cross-examination, Ms. Murphy asked to be dismissed.

¶ 16 After the other jurors were removed from the courtroom, the trial judge noted Juror Murphy was "obviously upset" and offered to meet with her in his office. The judge informed the attorneys, in Appellant's presence, that they were "certainly entitled to be in there when I visit with her." Neither attorney nor Appellant asked to be present.[4]

¶ 17 The in-chambers discussion was transcribed. The trial judge asked Ms. Murphy why she felt she could not serve, but cautioned her not to tell him her verdict or express an opinion on the case. Ms. Murphy indicated she did not have "any kind of verdict or anything," but stated her emotions were shot. The trial judge responded, "You don't feel you are emotionally able to deliberate and follow the Court's instructions?" Ms. Murphy replied, "Yes." The trial judge again noted Ms. Murphy was very upset and trembling. He stated, "I can see that she is sincere in her request to be dismissed. I need to visit with the lawyers and make sure that they don't have a problem with what I intend to do." After expressing his intent to

---

4. Defense counsel admitted he agreed to let the trial judge talk to Ms. Murphy alone. (Sent. Tr. 4).

dismiss Ms. Murphy and replace her with an alternate juror, Ms. Murphy disclosed she had a sick child at home. The trial judge, due to the "very difficult emotional nature of this case and what Mrs. Murphy has told me," decided it would be in the best interest of justice to replace her. The judge then stated, "I'm going to go inform the lawyers at this time. If they have any argument or opinions about that, I will return."

¶ 18 The trial judge's discussion with the attorneys was not transcribed. However, upon his return, alone, the trial judge stated, "I have related to the attorneys what your personal situation is with your child being sick and also your very obviously distressed emotional state. I have advised them I think it would be appropriate for you to be excused." Ms. Murphy was then dismissed, and the proceedings were adjourned for the day.

¶ 19 The following morning, defense counsel lodged an objection, just prior to the time the beginning of the final day of second stage proceedings. One of Appellant's attorneys pointed out Ms. Murphy had not mentioned a sick child until the end of the day and that the replacement juror would likely feel disadvantaged and less comfortable because she had not participated with the other jurors in first stage deliberations. The trial court overruled this objection.

¶ 20 Appellant filed a motion for new trial on January 5, 1999, the day of formal sentencing. Therein, Appellant asked the verdict to be set aside because: (1) Ms. Murphy had not stated she was sick in the morning when the second stage proceedings began; (2) the trial court had not required Ms. Murphy to provide "medical certification" that she or her children were ill; (3) Ms. Murphy became visibly upset during the testimony of Appellant's brother; (4) Ms. Murphy attempted to tell the trial judge additional reasons why she could not serve but the trial court would not allow her this opportunity; (5) the trial court abused its discretion by removing Ms. Murphy from the jury without giving defense counsel the opportunity to challenge her statements; and (6) Appellant was prejudiced by the dismissal of a juror believed to favor a verdict of less than death.

¶ 21 An affidavit from Ms. Murphy was attached to the motion. Therein, Ms. Murphy claimed: during first stage proceedings, she believed the State's evidence was lacking on intent to kill; she desired to render a "not guilty" verdict; other jurors dismissed her concerns about the quality of the evidence "in a matter that left me feeling coerced and pressured into changing my mind;" she finally "caved in" and agreed to vote guilty, although she had strong reservations; she felt pressured, sick, and worn down by the other jurors; based on discussions occurring during first stage deliberations, she believed most jurors had already made up their minds regarding punishment after the first stage of trial; during Lamont Miller's testimony, she began to feel sick and helpless; she felt as though she would again be coerced into a decision on punishment; she asked to be removed because she was feeling sick over prior pressure from her fellow jurors, her belief jurors had already made up their minds, and her desire to avoid such an unpleasant experience again; she did feel sick and have a sick child at home; she saw an opportunity to get out of service and took it; and her primary reasons for asking to be dismissed were the "close-minded views of the other jurors ... the other jurors' casual attitude toward the case, and because I did not want to be unfairly coerced and pressured again by the other jurors if I expressed views which differed from theirs."

¶ 22 After conducting a brief hearing on the motion on the day of sentencing, the trial judge ruled:

> [I]f this lady was inclined to deceive me and felt she could not be an effective juror, I'm even more convinced now from reading this motion that I did the right thing than I was when I did it initially ... I had some reservations about it, but if this lady was that deceptive to this Court when this young man's life was on the line, then I think that maybe I did it for the wrong reason, but I think I did the right thing, so that motion is overruled.

(Sent.Tr. at 6.)

 ¶ 23 A trial judge has inherent power to substitute a juror for good cause.

*Davis v. State*, 1983 OK CR 57, ¶ 45, 665 P.2d 1186, 1198; *Washington v. State*, 1977 OK CR 240, ¶ 27, 568 P.2d 301, 308. Indeed, 22 O.S.1991, § 601a provides for the use of alternate jurors to replace jurors who have become sick or have died [5] prior to the "final submission of the case." [6] We agree with Appellant, however, that this discretion ought to be used with great caution, especially in capital cases when a defendant's life is on the line.

¶ 24 The question, here, is whether or not the trial judge abused his discretion and inherent power to substitute jurors for good cause in his dismissal of Juror Murphy. Under the unique facts of this case, we find he did not.

¶ 25 The trial judge met with Ms. Murphy alone with defense counsel's permission. The record somewhat supports the trial court's finding that Ms. Murphy was sick at this time, although the cause of Ms. Murphy's sudden sickness appears, in hindsight, to be related to the emotional stress she was experiencing as a result of performing her duties as a juror. Nevertheless, the trial judge was forced to exercise extreme caution during his conference, for fear Ms. Murphy might reveal matters relating to jury deliberations or communicate her views about the evidence admitted at trial. *See* 22 O.S.1991, § 853.

¶ 26 The bottom line is Ms. Murphy told the trial judge she was sick, and, upon observing her demeanor, the trial judge agreed. Her affidavit does not provide otherwise. Therefore, the trial court had a sufficient basis for dismissing Ms. Murphy.

¶ 27 Moreover, Appellant, through his counsel, waived his right to object to, or challenge Ms. Murphy's sickness and her dismissal by not participating in the *in cam-*

era questioning of Ms. Murphy and by failing to lodge a contemporaneous objection at the end of the third day of trial, after the trial judge informed his counsel of his intentions to dismiss the juror. *See U.S. v. Gagnon*, 470 U.S. 522, 527–28, 105 S.Ct. 1482, 1485, 84 L.Ed.2d 486 (1985).

¶ 28 In retrospect, it appears Ms. Murphy may have been a sympathetic juror to Appellant had she remained on the jury.[7] However, the record supports the trial judge's decision. 22 O.S.1991, § 601.

¶ 29 Considering all of these points together, we find no abuse of discretion occurred in Juror Murphy's dismissal. Furthermore, Appellant has not demonstrated prejudice in Ms. Murphy's replacement by an alternate juror defense counsel had already accepted. *Thornburg v. State*, 1999 OK CR 32, ¶ 19, 985 P.2d 1234, 1244.

¶ 30 We further find Appellant was not denied the right to counsel, nor was he denied the right to be present during a "critical stage" of the proceedings. *See Stemple v. State*, 2000 OK CR 4, ¶ 15, 994 P.2d 61, 66 (finding no error in a defendant's absence during *in camera* hearing with spectator who had spoken with a juror); *see also Rushen v. Spain*, 464 U.S. 114, 118, 104 S.Ct. 453, 455–56, 78 L.Ed.2d 267 (1983) (where the Court found an unrecorded *ex parte* communication between trial judge and juror could be harmless error, stating: "There is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial." [8])

¶ 31 Not every *in camera* hearing with a juror qualifies as a critical stage of the proceedings. However, when a seemingly sympathetic juror suddenly asks to be dismissed

5. The trial court's discretion to substitute jurors is not limited to cases of sickness and death. *See Washington*, 1977 OK CR 240, ¶ 26, 568 P.2d at 308.

6. In a bifurcated, two-stage proceeding, the "final submission of the case" occurs when the jury retires to deliberate upon the sentence in the punishment or second stage of the proceedings. 22 O.S.1991, § 601b.

7. It is not our job on appeal to delve into such matters of jury deliberation. Were we to do so as a matter of course, it seems likely we would often find jurors struggling one way or another with their responsibilities as jurors.

8. Of course, here, the communication was recorded, Appellant's counsel agreed to the meeting, and counsel was informed about what was discussed.

following emotional second stage testimony from a defendant's brother, an *in camera* hearing addressing those concerns is indeed a critical stage. Nevertheless, counsel may affirmatively waive his presence and that of his client at such hearing, and counsel did so here. *See Gagnon*, 470 U.S. at 527–28, 105 S.Ct. at 1485 ("The district court need not get an express 'on the record' waiver from the defendant for every trial conference which a defendant may have a right to attend.") However, such a waiver is susceptible to an ineffective assistance of counsel claim, and we will address that issue further below.

¶ 32 In his seventh proposition of error, Appellant claims the trial court erred by allowing the admission of improper victim impact evidence. Appellant claims the victim's sister[9] and mother[10] were improperly allowed to give their opinions on a recommended sentence and then amplify them. He claims he had no notice of this testimony and that it constituted improper lay opinion on the issue of continuing threat. He further claims the trial court failed to determine the existence of evidence of an aggravating circumstance before admitting the victim impact evidence, in violation of our directive in *Cargle v. State*, 1995 OK CR 77, ¶ 76, 909 P.2d 806, 828. Finally, Appellant claims the trial court failed to properly instruct the jury regarding use of victim impact evidence, in violation of *Cargle*, and that victim impact evidence has no place in Oklahoma's capital sentencing scheme. According to Appellant, these alleged errors violated his rights under the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution and under Article II, §§ 7 and 9 of Oklahoma's Constitution.

¶ 33 The State provided written notice of its intention to use victim impact evidence and sent copies of the witnesses' handwritten statements well within the ten day discovery deadline. Unfortunately, the notice and statements did not disclose the witnesses would testify about a recommended punishment.

¶ 34 Although 22 O.S.Supp.1998, § 984 allows victim impact witnesses to testify regarding their "opinion of a recommended sentence," it was error for the trial court to allow them to do so where ten (10) days notice was not given.[11] *See Cargle*, 1995 OK CR 77, ¶ 76, 909 P.2d at 828 ("the evidence sought to be introduced should be limited to the evidence listed in the prosecutor's notice filed before trial.") While that error may not have amounted to an abuse of discretion, it did have further implications.

¶ 35 Had the trial court properly excluded the testimony regarding a sentence recommendation as untimely, the additional improper testimony regarding the witnesses' opinions as to why Appellant should be put to death would also have been excluded. As we said in *Ledbetter v. State*, 1997 OK CR 5, ¶ 31, 933 P.2d 880, 891, in regard to statements of recommended punishment:

> [W]hile theoretically admissible, this evidence will be viewed by this Court with a heightened degree of scrutiny as we apply the probative-value-versus-prejudicial-effect analysis. Any opinion as to the recommended sentence should be given as a

---

9. The victim's sister, Camille, testified, "I feel that the death penalty is appropriate." The prosecutor asked her why she felt this way. Camille answered, "Because there was no reason. He doesn't even know my brother. Nobody over there even knows him." The prosecutor asked if there was something about life or life without parole that concerns her. Camille answered, "That one day he could be living out in the streets. Somebody could cut him off in traffic, and there is their life or their children's life. Or even in jail he could kill more people." Tr. III at 80.

10. The victim's mother, Lillian Brown, also testified that Appellant should, in her opinion, receive the death penalty. When asked why, Ms. Brown testified, "He's a menace and a threat to everyone in society. It's no telling when he is likely to explode. He has shown himself to be unrepentant, without remorse, and I just don't think there is much hope for rehabilitation." Tr. III at 88.

11. The prosecutor notified the trial court that the witnesses would give their recommendation regarding sentence just prior to the time they were called to testify. Defense counsel objected based on lack of notice, but the trial court allowed the testimony, finding it would not surprise or prejudice the defense. Tr. III at 71. However, the trial court cautioned the defense and the witnesses to limit their statements to what was written and a sentence recommendation.

straightforward, concise response to a question asking what the recommendation is; or a short statement of recommendation in a written statement, without amplification.

*See also Salazar v. State,* 1998 OK CR 70, ¶ 27–28, 973 P.2d 315, 325 (less forceful statements concerning a death penalty recommendation were "over-amplified".)

■■■ ¶ 36 Here, the witnesses' amplified opinions about Appellant's lack of remorse, his inability to be rehabilitated, and his being dangerous to those inside and outside of prison, were obvious violations of *Ledbetter.* Appellant did not contemporaneously object to this testimony, however, thus waiving all but plain error. (Clearly, defense counsel had the opportunity to further object about the amplifications after the witnesses gave their brief opinions regarding recommended punishment.)

■■ ¶ 37 Meanwhile, the trial court failed to determine the existence of evidence of an aggravating circumstance before admitting the victim impact evidence and by failing to properly instruct the jury regarding its use, as required by *Cargle.* However, we find evidence of at least two aggravators clearly present in the record-that Appellant knowingly created a great risk of death to more than one person and was previously convicted of a felony involving the use or threat of violence to the person. Thus, the trial court's error on this point was harmless.

■■ ¶ 38 More problematic, however, is the lack of the so-called *"Cargle "* instruction on victim impact. *See* OUJI–CR(2d) 9–45. We have previously held that "while the *Cargle* instruction is directed to be given, the failure to give the instruction is not automatically fatal." *Powell v. State,* 2000 OK CR 5, ¶ 121, 995 P.2d 510, 535. However, in *Powell,* we specifically addressed the importance of using the instruction when the victim impact evidence is borderline or crosses over the line of what can be considered permissible, as it does here. Defense counsel should have asked for the *Cargle* instruction, and the trial court should have given it, even without a request.

¶ 39 We find plain error in the admission of victim impact evidence containing amplified recommendations of punishment and which speculated as to Appellant's motivation and future dangerousness. Here, the victim impact witnesses essentially testified about ultimate issues in the case, i.e. whether Appellant was a continuing threat to society, whether or not Appellant could be rehabilitated, whether he had remorse, and whether his actions were justified. Such evidence is extremely dangerous, as it could easily lead to jurors substituting their own opinions with those of the victims, those who suffered the most from the crime. To the extent such evidence could ever be considered harmless, the absence of a *Cargle* instruction requires us to find it was not harmless here. Furthermore, this issue touches upon ineffective assistance of counsel, which we will consider further below.

¶ 40 In his ninth proposition of error, Appellant claims he received ineffective assistance of counsel in violation of the Sixth Amendment to the U.S. Constitution and Article II, § 20 of Oklahoma's Constitution. For the reasons set forth below, we agree.

¶ 41 Before beginning, however, we reemphasize what the United States Supreme Court said in *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984) regarding claims of ineffective assistance of counsel:

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Cf. Engle v. Isaac,* 456 U.S. 107, 133–134, 102 S.Ct. 1558, 1574–1575, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong

presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *See Michel v. Louisiana, supra,* 350 U.S., [91] at 101, 76 S.Ct., [158] at 164 [100 L.Ed. 83]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

This Court takes these words from *Strickland* seriously and will continue to apply a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.

¶ 42 Nevertheless, based upon our review of the entire record, we find Appellant's attorneys were deficient when they waived Appellant's and counsels' presence during the trial judge's *in camera* hearing with Juror Murphy, failed to object to the amplified victim impact statements, which embraced ultimate second stage issues, and failed to request a *Cargle* instruction. Additionally, we find evidence in the record that there was a significant breakdown in communication between Appellant and his trial attorneys, for whatever reason, and this breakdown in communication appears to have had an overreaching effect on Appellant's ability to assist counsel in his defense.

▪▪▪▪ ¶ 43 We find no valid trial strategy in defense counsels' decision to waive their presence during the trial court's *in camera* hearing with Juror Murphy or in their failure to object to her dismissal on the record at the time Ms. Murphy was dismissed or even attempt to rehabilitate her. It is difficult, if not impossible, to assess the prejudicial nature of the actions. However, we find it important that during the extremely brief *voir dire* questioning of prospective Juror Murphy, Ms. Murphy stated that she worked with the mentally retarded and her work would affect her decisions on punishment. Considering the fact that Ms. Murphy became upset following testimony from Appellant's brother during the second stage and, as counsel admitted in a motion for new trial,

her reaction was obvious to those in the courtroom, we believe counsel had a duty to participate in that conference with hopes of rehabilitating the juror, if possible or necessary.

¶ 44 Due to the very nature of a capital trial and the intense scrutiny that will occur throughout the appellate process, trial judges and all participating attorneys must be vigilant in their efforts to make extensive records of their decisions. In the instant case, we commend the trial judge for inviting the attorneys to participate in the *in camera* meeting with the juror, if they so desired. However, because the stakes were so high, it would have been prudent for the trial judge to go even farther and insist upon the presence of all the attorneys during the *in camera* hearing. While the hearing was transcribed, that transcription only underscored the importance of trial counsel's participation.

¶ 45 Of course, most of the blame here must fall on the attorneys for waiving their presence at the hearing and for failing to make a record at the time dismissal was suggested.

▪▪▪▪ ¶ 46 Additionally, we find defense counsels' failure to object to the amplified statements from the victim impact witnesses regarding their reasons for recommending the death penalty, including one witness's religious underpinnings, fell below an objective standard of reasonableness. Although defense counsel did object at the outset to any additional testimony outside the State's notice, an additional objection should have been made when the prosecutor asked the victim impact witnesses to amplify their reasons for recommending death, especially after the trial judge had instructed the prosecutor to stay within the confines of the written statements. Furthermore, had the attorneys requested a *Cargle* instruction (and had the same been given), the prejudicial impact would surely have decreased.

▪▪▪▪ ¶ 47 Additionally, from our review of the trial and the evidentiary hearing transcripts, we are troubled by what can only be described as a serious breakdown in communication between Appellant and his attor-

neys. While this breakdown in communication may not technically fall under the rubric of ineffective assistance, it does to the extent the problems were not presented to the trial judge so that the possibility of appointing new counsel to represent Appellant could be explored.

¶ 48 A cornerstone to our judicial system is a criminal defendant's right to an independent attorney who can provide competent counsel throughout the proceedings. With retained counsel, a defendant has made a choice regarding the counsel who will represent him or her. When counsel is court-appointed, a defendant does not have that right of choice, but he or she still has the right to an independent counsel who is committed to zealously represent the defendant through the completion of the case.

¶ 49 We won't belabor this point, but there is strong evidence in the record that something was just not right between Appellant and his attorneys. In the days prior to the beginning of trial, Appellant's attorneys filed an application for outpatient psychological treatment, which stated Appellant "does not trust either of the two counsel representing him." The application admitted, however, Appellant was able to communicate with a female investigator and with another indigent defense attorney.

¶ 50 Additionally, the application indicated Appellant had been diagnosed with psychological problems of depression and possible paranoid schizophrenia. The application alleged medications could help Appellant with his condition, but that he had not been on such medications while incarcerated. The attorneys also indicated their belief that Appellant's lack of medications was undermining Appellant's ability to rationally assist in his defense.

¶ 51 There is no indication in the record, however, that these issues were ever resolved prior to trial. As the trial began, one of Appellant's attorneys asked the trial judge for permission for his investigator to sit at the table with Appellant in order to "assist in communicating with our client." This request was granted without further discussion. There is no indication Appellant had received any medication or psychiatric care,

and it does not appear the issues raised in the application were ever considered by the trial judge.

¶ 52 During the extensive evidentiary hearing conducted upon remand by this Court regarding the claims of ineffectiveness, the breakdown in communication between Appellant and his attorneys was further explored. One of Appellant's attorneys admitted the relationship had been strained and that, at some point, Appellant stopped talking to him. He agreed the strain may have related to Appellant's adamant refusal to accept plea offers that would have prevented a capital trial and saved his life.

¶ 53 Appellant's other attorney also testified about the breakdown in communication. He admitted Appellant was very reserved and would not provide information. The attorney believed Appellant had the capacity to communicate, but he felt as though Appellant "chose not to."

¶ 54 In addition to possible psychological problems, lack of medication, and counsels' efforts to get Appellant to accept a plea, many other possible reasons were offered at the evidentiary hearing regarding why Appellant stopped communicating with his attorneys. One of Appellant's attorneys was on medical leave for three months just prior to the beginning of the trial. There was some testimony Appellant preferred an earlier attorney assigned to him. Furthermore, there is evidence that Appellant is mildly mentally retarded, and there was conflicting testimony about him being despondent before trial. One of his attorneys offered the possibility that Appellant might want to die rather than be subjected to prison rape.

¶ 55 And finally, Appellant reportedly told one indigent defense attorney that he had no intention of dealing with his trial attorneys because one had made a derogatory racial comment about him. When questioned about this, the attorney denied making such a statement in front of Appellant or his family. The attorney said he may have made the comment in private, however, and he did admit to making a similar comment in front of his co-counsel and investigator. He also claimed the investigator had made the same

comment. · If Appellant, in fact, heard the attorney make the comment or was aware that he made the comment or one similar to it, as reflected by the testimony of at least one witness, it would more than explain why Appellant would not want to talk to the attorney.

¶ 56 Whether caused by one of these reasons or a combination of several, the breakdown in communication between Appellant and his attorneys may very well have affected numerous areas of the trial. In his appellate brief, Appellant raised issues relating to the attorneys' failure to request certain jury instructions, failure to properly investigate and use first stage evidence, and the waiving of Appellant's right to testify. In the application for evidentiary hearing, Appellant raised issues relating to the attorneys' failure to have his competency to stand trial tested, failure to investigate and present evidence, failure to locate and interview witnesses, and failure to prepare for trial because trial counsel hoped Appellant would take a plea offer. Had there been even a basic attorney-client relationship, many of these issues might never have arisen.

¶ 57 We commend the trial judge for his efforts in regard to the evidentiary hearing, including the extensive findings of fact and conclusions of law the trial judge reached in regard to that hearing, most of which we readily agree.[12] Based upon the evidence presented, the trial judge did an excellent job of adjudicating the issues raised in the application, many of which proved to be lacking in real evidentiary weight when the actual witnesses were brought to the stand.

¶ 58 Nevertheless, the evidentiary hearing emphasized the communication breakdown that was already evident from the trial transcripts and the appellate briefs. The bottom line is the attorneys could not effectively communicate with their client, for whatever reason, and they should have sought to withdraw from representation and to notify the trial judge regarding their inabilities in this area.

¶ 59 We see many capital cases where the relationship between the attorneys and the client has become strained. We do not rule here that such a strained relationship, standing alone, requires the removal of an attorney or the reversal of those cases. However, when a client completely refuses to talk to his attorneys and we have a record that poses a grave concern that this refusal was caused by the attorneys' negative attitudes toward Appellant's plea decisions or about the type of case this was, or one attorney's derogatory comments, along with the other issues addressed in this opinion, we cannot in all good conscience say Appellant received a fair trial, a proceeding with a result that can be considered reliable. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

**DECISION**

¶ 60 Appellant's convictions and sentences are hereby **REVERSED,** and the matter is **REMANDED** to the District Court of Co-

---

12. Given the evidence available to defense counsel, including their personal belief that Appellant was competent and their trial expert's complete failure to raise any question regarding Appellant's incompetence to stand trial, we find defense counsel were not ineffective for failing to have Appellant's competency tested. (Nevertheless, we are troubled by some of the issues raised, but never resolved, in the application for out-patient psychological treatment.) We also agree that the evidence does not show defense counsel failed to follow the orders of their indigent defense system supervisors by not requesting competency to be evaluated. On this point, many of the rules of professional responsibility arguably come into play. The attorney of record is the one charged with the responsibility of providing competent representation to his or her client, of bringing only meritorious claims, and of independently exercising his or her own pro-

fessional judgment. *See* Rules 1.1, 1.7, 2.1, 3.1, 5.1 and 5.2, *Oklahoma Rules of Professional Conduct*, Title 5, Ch.1, App. 3 A (2000). Supervisors have their own responsibilities. *Id.* In this case, the trial attorney stated he did not believe Appellant was incompetent, but his supervisor wanted him to file an application for determination of present competency. This resulted in a complex professional responsibility dilemma, i.e. whether or not to submit to an application the attorney personally believed was unsupported in fact and likely false or to submit to the will of a supervisor who had no contact with the defendant, except through hearsay. It seems to us such supervisory efforts would be better spent on ensuring trial attorneys are adequately prepared prior to trial, have utilized all appropriate resources available to them prior to trial, and will act professionally and treat their clients as a professional should throughout the course of representation.

manche County for a new trial consistent with this Opinion.

JOHNSON, V.P.J., and STRUBHAR, J., concur.

CHAPEL, J., concurs in result.

LILE, J., dissents.

LILE, Judge: Dissents.

¶ 1 I find the trial judge's handling of the victim impact evidence to have been proper. The fact that two of the victim's family members felt the death sentence was the appropriate sentence was properly admitted under 22 O.S.1991, § 984, which plainly provides for admission of "the victim's opinion of a recommended sentence." The improper amplification of that sentence was not objected to by Appellant's trial counsel and any error was waived. Further, defense counsel did not request a *Cargle* instruction and any error in that regard is waived, under the facts of this case.

¶ 2 I believe that the trial judge's handling of Juror Murphy was proper. The trial court offered the attorneys the opportunity to participate in the in camera hearing and that opportunity was declined.

¶ 3 Concerning the issue of incompetency of trial counsel I point out that the trial judge has provided a comprehensive and thorough order setting forth Findings of Fact and Conclusions of Law Following Evidentiary Hearing, one of the best I have seen. I agree with its conclusions. I would affirm.