2009 OK CR 11

**Donald Anthony GRANT, Appellant**

v.

**STATE of Oklahoma, Appellee.**

No. D–2006–14.

Court of Criminal Appeals of Oklahoma.

March 23, 2009.

Mark Barrett, Perry Hudson, Attorneys at Law, Norman, OK, attorneys for defendant at trial.

Sandra Elliott, Suzanne Lister, Assistant District Attorneys, Oklahoma City, OK, attorneys for the State at trial.

Lee Ann Jones Peters, James H. Lockard, Indigent Defense System, Norman, OK, attorneys for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Preston Saul Draper, Assistant Attorney General, Oklahoma City, OK, attorneys for the State on appeal.

**OPINION**

C. JOHNSON, Presiding Judge.

¶ 1 Appellant, Donald Anthony Grant, was charged in Oklahoma County District Court, Case No. CF–2001–4696, with two counts of First Degree, Malice Aforethought Murder (21 O.S.2001, § 701.7(A)), and two counts of Robbery with Firearms (21 O.S.2001, § 801). As to the murder counts, the State alleged a number of aggravating circumstances in support of the death penalty.[1] Jury trial was held November 14 through 23, 2005 before the Honorable Jerry D. Bass, District Judge. The jury found Appellant guilty as charged on all counts. As to the robbery counts, the jury recommended sentences of life imprisonment. As to each of the murder counts, the jury found the existence of all aggravating

---

1. As to both murder counts, the State alleged (1) that the defendant knowingly created a great risk of death to more than one person; (2) that the murders were committed for the purpose of avoiding arrest or prosecution; (3) that the murders were committed by a person serving a sentence of imprisonment on conviction of a felony; and (4) that a probability existed that the defendant would pose a continuing threat to society. As to one of the murder counts (Count 2), the State also alleged that the murder was heinous, atrocious, or cruel.

circumstances alleged, and recommended punishment of death on each count. This appeal followed.[2]

## SUMMARY OF THE FACTS

¶ 2 The essential facts of the crimes are not disputed. On July 18, 2001, Appellant entered a LaQuinta Inn in Del City, ostensibly to fill out an employment application. In reality, Appellant had planned to rob the hotel in order to obtain money to post bond for a girlfriend, Shlonda Gatewood (who was in the Oklahoma County Jail at the time), and was prepared to kill any witnesses to the crime. Appellant may have been motivated to strike this particular business because another girlfriend of his, Cheryl Tubbs, had been fired from employment there a few months before; in any event, Appellant was familiar with the layout of the property and the location of video surveillance equipment.

¶ 3 When Appellant saw the hotel manager, Brenda McElyea, he approached her with a pistol in his hand and ordered her to walk to a storage room, where he fatally shot her once in the head, and slashed her neck and back with a box knife to make sure the knife was sharp enough to use on his next victim. Appellant then left the storage room and approached another employee, Suzette Smith, in the break room. Appellant ordered Smith at gunpoint to give him the money from the hotel register, which she did. Appellant then ordered Smith to walk back to the manager's office, where he shot her three times in the face. Smith continued to struggle to escape, so Appellant brutally beat her and cut her numerous times with his knife. He hit Smith in the head with his

pistol, attempted to break her neck, and threw a computer monitor on her head in an effort to stop her struggling. Eventually, Smith succumbed to her wounds and died in the office. Before leaving the office, Appellant took personal property from Smith's purse.

¶ 4 Appellant then left the hotel and walked to a nearby discount store, where he abandoned his pistol and some traveler's checks he had taken in the robbery.[3] He then called a cab to take him to the home of Cheryl Tubbs. Later that day, Appellant used money from the robbery to pay Shlonda Gatewood's bond, which was about $200. Appellant and Gatewood then used a stolen car to drive from Oklahoma City to New York City, where Appellant had family. About a month after the murders, Appellant was arrested in New York and returned to Oklahoma.[4]

## ANALYSIS

¶ 5 Although he held the State to its burden of proving each element of the crimes, Appellant did not contest the State's claim that he was guilty of robbing and murdering Smith and McElyea. Similarly, on appeal, Appellant's complaints do not concern the sufficiency of the evidence to support his convictions *per se*.[5]

## I.

### APPELLANT'S COMPETENCY TO STAND TRIAL

¶ 6 In Proposition 1, Appellant claims that he was incompetent to stand trial. Ap-

2. Sentencing was held January 6, 2006. The appeal record was transmitted to this Court on or about February 28, 2007. Appellant's opening brief was filed October 11, 2007. The State's response was filed January 9, 2008. Appellant filed a reply brief February 28, 2008.

3. A few weeks after the crimes, the surveillance video that Appellant had removed from the hotel's recorder was found in a wooded area between the hotel and the discount store.

4. Incriminating details of Appellant's motive, preparation, and execution of these crimes were presented in the guilt stage of the trial through the testimony of Gatewood, who related what Appellant had told her. A similar account was

presented in the punishment stage of trial, through a letter that Appellant had written a few weeks before trial. Appellant also offered additional details when he elected to testify in the punishment stage.

5. Appellant personally concurred in his counsel's strategy to acknowledge guilt. The trial court made a sufficient record on this issue. *See Jackson v. State,* 2001 OK CR 37, ¶ 29, 41 P.3d 395, 400–01. Although Appellant argues in Proposition 2 that he desired to proceed *pro se,* the soundness of counsel's strategy to acknowledge guilt is not challenged on appeal.

pellant's competency was placed into question very early in this prosecution. In November 2001, a few months after Appellant's apprehension, defense counsel moved for a determination of competency. Over the next several years, Appellant was examined a number of times by a number of different mental-health experts. We need not present a detailed chronology here. Suffice it to say that the experts tended to agree that Appellant had some sort of mental illness, probably a form of schizophrenia. At one point, experts retained by both the State and the defense questioned Appellant's competency to stand trial, but by early 2005, experts on both sides believed that he was competent to proceed. A jury trial on the issue of competency was held in February 2005. The State presented its retained expert, Dr. John Call, as a witness. The defense did not call its chief expert, Dr. Curtis Grundy (who at the time believed Appellant to be competent), but instead relied on the testimony of defense counsel who had represented Appellant from the fall of 2001 until April 2003. The jury found Appellant competent to proceed, and the jury trial on guilt and punishment took place about nine months later.

¶ 7 Appellant submits that in the months between the competency trial and the trial on guilt and punishment, his competency may well have deteriorated. He points to his statements at various pretrial and *in camera* hearings, *pro se* writings, and his testimony in the punishment stage of the trial in an attempt to support this claim. He also submits extra-record evidence to support a related claim, based on the Sixth Amendment right to counsel, that trial counsel was deficient for not challenging his competency at the time of trial. Specifically, he presents (1) an expert's retrospective opinion, based on evaluation of various materials, that Appellant was not competent to stand trial in November 2005; and (2) documentary evidence suggesting that in mid–2005, Appellant was not diligent about taking medications prescribed to treat his mental illness.

 ¶ 8 The constitutional guarantee of due process of law has been interpreted to include the right to be tried only when one is sufficiently competent to understand the na-

ture of the charges and to assist counsel in preparing a defense. *Cooper v. Oklahoma,* 517 U.S. 348, 354, 116 S.Ct. 1373, 1376, 134 L.Ed.2d 498 (1996); *Drope v. Missouri,* 420 U.S. 162, 171–72, 95 S.Ct. 896, 903–04, 43 L.Ed.2d 103 (1975). The law may presume a defendant is competent, and require him to shoulder the burden of proving his incompetence by a preponderance of evidence. *Medina v. California,* 505 U.S. 437, 452–53, 112 S.Ct. 2572, 2581, 120 L.Ed.2d 353 (1992). Under Oklahoma law, a person is competent to stand trial if he has the present ability to understand the nature of the charges and proceedings brought against him and to rationally assist in his own defense. 22 O.S.Supp.2005, § 1175.1(1). These standards are consistent with federal constitutional requirements. *Cooper,* 517 U.S. at 354 & n. 5, 116 S.Ct. at 1377 & n. 5; *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960).

 ¶ 9 Although competency is presumed, once a defendant has presented sufficient evidence to raise a doubt about his competency, Oklahoma law affords him the right to a jury trial on the issue. 22 O.S. 2001, § 1175.1 *et seq.* Competency is a fluid concept, and a defendant's competency (or at least doubts about his competency) may come and go throughout the proceedings. The trial court's decision whether sufficient doubt exists about a defendant's ability to proceed is reviewed for an abuse of discretion. *Beck v. State,* 1981 OK CR 30, ¶ 3, 626 P.2d 327, 328. The trial court may consider the defendant's behavior, his demeanor at trial, and of course any expert evidence on the issue. *Drope,* 420 U.S. at 180, 95 S.Ct. at 908. Typically, the court will rely heavily on the perceptions of defense counsel, whose job it is to consult with his client personally, explain the proceedings to him, and obtain relevant information from him about how to proceed. *See Bryson v. Ward,* 187 F.3d 1193, 1201 (10th Cir.1999).

¶ 10 Initially, we note that the judge who presided over Appellant's trial had been assigned to this case in March 2003, and presided over the competency trial in February 2005. Closer to the time of trial on guilt and punishment, and during the trial itself, the

court had several discussions with Appellant about various matters, including potential conflicts of interest and defense counsel's strategy of acknowledging guilt. Thus, the trial court not only observed Appellant personally in pretrial settings, but conversed with him about matters bearing directly on his ability to understand choices in legal strategy. Our review of these exchanges shows Appellant to have had a rather keen understanding of the legal process, and shows he was able to make important decisions.[6] The letter Appellant addressed to the prosecutor shortly before trial, wherein he detailed his commission of the crimes, may not have been the most prudent course of action, but it does not show that he was unable to grasp the ramifications of such an admission. To the contrary, the letter indicates that Appellant was fully aware of what he was doing. Similarly, Appellant's testimony in the punishment stage of trial, wherein he tried to explain his actions but expressed no remorse, may not have been beneficial to him, but it does not indicate an inability to comprehend the nature of the proceedings.[7]

¶ 11 Appellant's two-lawyer defense team was experienced and zealous, considering that the overwhelming evidence against their client limited their options. At no time did either of them express doubts about their client's competency during the trial. Their chief mental-health expert, Dr. Grundy, who spent many hours interviewing Appellant over the lengthy course of the prosecution, attended at least part of the trial and testified for the defense. Yet, there is no indication that Dr. Grundy had doubts about Appellant's competency, either at that time or on reflection afterward. Appellant asks this Court to disregard the lack of doubt by those who interacted with him at the time, and substitute the retrospective evaluation of a different expert, Dr. McGarrahan, that Appellant now presents on appeal.

¶ 12 According to the supplementary materials Appellant has presented, Dr. McGarrahan interviewed trial counsel and Appellant some two years after trial, and reviewed (among other things) Appellant's medical records while he was in jail awaiting trial. Both trial attorneys maintained that at the time of trial, they believed Appellant understood the nature of the proceedings. Nevertheless, Dr. McGarrahan concludes that Appellant was unable to "rationally assist" them in his defense. This claim seems to be based on the fact that Appellant testified in the punishment stage against counsel's advice. Just as we do not judge counsel's effectiveness solely by the success of their strategies, see Coddington v. State, 2006 OK CR 34, ¶ 28, 142 P.3d 437, 446, we refuse to judge a defendant's competency solely by the wisdom of his own choices.[8]

6. Appellant points to several cryptic comments in his writings, in his colloquies with the court, and in his trial testimony, as evidence that he did not understand the nature of the proceedings. But these comments were not delusions that sprang from Appellant's own mind. They related to an unconventional philosophy, or religion of sorts, that Appellant adhered to, similar in some respects to the Black Muslim or Nation of Islam movements, and known variously as "The Nation of Gods and Earths" or "The Five Percenters." This set of beliefs is not uncommon among inmates in the Northeastern United States, where Appellant had grown up and been incarcerated. See generally Hetsberger v. Dept. of Corrections, 395 N.J.Super. 548, 929 A.2d 1139, 1140–41 (2007); see also http://www.apologeticsindex.org/ 426–five–percent. (offering a synopsis of this philosophy). Cf. United States v. Mackovich, 209 F.3d 1227, 1233–34 (10th Cir.2000) (defendant's claims that the color of the fringe on the courtroom's United States Flag voided the court's authority did not support a claim that he was incompetent; citing similar arguments made by other defendants in other cases).

7. For example, when the prosecutor, on cross-examination, asked Appellant to detail how he went about the murders, Appellant replied, "Do you actually want to hear this?"

8. We also resist the temptation to classify strategic trial decisions as either ingeniously clever or hopelessly doomed. Any successful strategy will almost always be deemed to have been a sound one. At least in the context of avoiding the death penalty, a strategy only needs to convince one juror that the defendant's life should be spared. One could argue that, given the evidence of Appellant's guilt, the aggravating circumstances, and Appellant's remorseless pretrial confession, he had little to lose by testifying in the punishment stage. After evidence of Appellant's mental problems and his childhood environment, Appellant's testimony might have been enough to convince a single juror to extend sympathy to him and spare his life. Dr. McGarrahan's interview indicates that even lead trial counsel harbored "varying agreeability" with the notion of allowing Appellant to testify.

**10**

¶ 13 The jail records regarding Appellant's medication history do not warrant a different result. Appellant claims these logs show that he was, at times, non-compliant in taking his prescribed medication. However, the affidavit accompanying these logs indicates that complete records for crucial time periods—particularly, most of September 2005, all of October 2005, and most of November 2005, when the trial was held—are missing or incomplete. We find these supplementary materials insufficient to overcome the presumption that trial counsel had a sound basis for believing Appellant was competent at the time of trial.[9] *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Browning v. State,* 2006 OK CR 8, ¶ 14, 134 P.3d 816, 831 (on claims of ineffective counsel, courts should begin with the presumption that counsel acted reasonably and consistent with prevailing professional norms). In summary, we find no reason to second-guess the judgment of those parties most familiar with Appellant's history of mental problems before and during the trial—defense counsel, the trial court, and the defense experts retained at that time. The record supports a conclusion that Appellant was competent at the time of his trial. This proposition is denied.

## II.

### APPELLANT'S REQUEST TO REPRESENT HIMSELF

■ ¶ 14 In Proposition 2, Appellant contends that he was denied his right to represent himself at trial. Counsel was appointed to represent Appellant shortly after his apprehension in the fall of 2001. Lead counsel at Appellant's trial was appointed to replace original counsel in April 2003. Several weeks before trial, Appellant wrote a letter indicating that he wished to be relieved of counsel. The trial court took no action at that time. Appellant claims that this letter was an unequivocal request to proceed *pro se.* He argues that the right to represent oneself is of constitutional dimension, and that because, generally speaking, a presumption exists against waiver of constitutional rights, the trial court's failure to promptly conduct a hearing on his request denied him his constitutional right to proceed *pro se.*

■ ¶ 15 The right to counsel, explicitly guaranteed by the Sixth Amendment to the federal Constitution and analogous provisions of the Oklahoma constitution, has been interpreted to include the converse as well: the right to represent oneself, without the aid of counsel.[10] The fact that each right is the reverse of the other, however, poses a problem for Appellant's argument that he was not shown to have "waived" his right to represent himself. The Sixth Amendment has been interpreted to guarantee counsel even without an affirmative request. *Carnley v. Cochran,* 369 U.S. 506, 513, 82 S.Ct. 884, 889, 8 L.Ed.2d 70 (1962); *Jewell v. Tulsa County,* 1969 OK CR 54, ¶ 15, 450 P.2d 833, 837. Because this two-sided constitutional guarantee defaults to the appointment of counsel, it is incumbent on the accused to timely and clearly decline that right; if his initial request is not heeded, he must renew it before trial. *Bowen v. State,* 1980 OK CR 2, ¶¶ 20–21, 606 P.2d 589, 594; *Stowe v. State,* 1979 OK CR 4, ¶¶ 8–9, 590 P.2d 679, 681–82.[11]

¶ 16 The trial court held several pretrial colloquies with Appellant. We can conceive of no better opportunity for him to have expressed any desire to proceed *pro se.* Yet he did not even suggest dissatisfaction with

9. These extra-record materials were submitted contemporaneously with Appellant's brief, in conjunction with a claim of ineffective assistance of counsel. *See* Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals,* 22 O.S., Ch. 18, App. (2009). Appellant's motion to supplement the record with these materials is **DENIED.**

10. *See McKaskle v. Wiggins,* 465 U.S. 168, 174, 104 S.Ct. 944, 948–49, 79 L.Ed.2d 122 (1984) (the "language, structure, and spirit" of the Sixth Amendment's Counsel Clause "implies" a right in the defendant to conduct his own defense).

11. While the accused has autonomy in this regard, that autonomy is accompanied by the responsibility to make his desires clear. *Cf. McKaskle,* 465 U.S. at 183, 104 S.Ct. at 953 ("Once a *pro se* defendant invites or agrees to any substantial participation by counsel, subsequent appearances by counsel must be presumed to be with the defendant's acquiescence, at least until the defendant expressly and unambiguously renews his request that standby counsel be silenced").

present counsel, much less ask to proceed without any whatsoever. These colloquies show that Appellant had specific ideas about trial strategy, and that he was satisfied that his counsel was acting consistently therewith.[12] The record does not support a conclusion that Appellant made a clear, unequivocal expression of the desire to waive the assistance of counsel and proceed *pro se*. This proposition is denied.

## III.

## ISSUES CONCERNING THE COMPOSITION OF THE JURY

¶ 17 Appellant makes several complaints regarding the composition of the jury that convicted him. The trial court is vested with considerable discretion in matters involving selection of jurors, because it is able to personally observe the panelists, and take into account a number of non-verbal factors that do not transfer well, if at all, to the transcript page. *Harris v. State*, 2004 OK CR 1, ¶ 11, 84 P.3d 731, 741. A defendant is entitled to a fair and impartial jury, but his right to participate in jury selection involves the right to reject unfit panelists, not to include particular panelists he may prefer. *Lewis v. State*, 1978 OK CR 123, ¶ 4, 586 P.2d 81, 82.

### A. The trial court's refusal to remove Panelist A. for cause.

¶ 18 In Proposition 3, Appellant claims the trial court erred in not removing Panelist A. from the venire for cause. He contends it was unfair to force him to use a peremptory challenge to remove this panelist. Appellant timely requested removal of Panelist A. for cause, used a peremptory challenge to remove him, used all of his remaining peremptory challenges, and requested an additional challenge, specifying who else he would excuse and why. This issue is thus properly preserved for appellate review. *Rojem v. State*, 2006 OK CR 7, ¶ 27, 130 P.3d 287, 294.

¶ 19 Panelist A. was initially passed for cause by both parties. However, during defense *voir dire*, counsel inquired about panelists' experiences with and attitudes on mental illness. Panelist A. was one of several panelists who indicated that they had friends or family who suffered from mental illness. Some of these panelists did not wish to speak about the matter in open court, and discussed it at the bench. Yet when asked about the details of his experiences with mental illness, Panelist A. said, "I'd rather not discuss it," even at the bench. The trial court had counsel move on to other panelists and topics, but during a recess, the court resumed the discussion with counsel and Panelist A. The trial court made it clear that the purpose of the inquiry was to determine whether A. could fairly consider evidence of mental illness if it were presented to him. Panelist A. said, "Yes." After further inquiry by both counsel, Panelist A. conceded that his initial attitudes about mental illness might place the defense at a disadvantage, and he agreed "that wouldn't be fair." When the prosecutor assured Panelist A. that, as the finder of fact, he would not be required to believe evidence of mental illness, Panelist A. asked, "Doesn't that compromise the duty of the jury?" The prosecutor responded that it did not, so long as he could be fair about considering the evidence in the first place.

---

12. In fact, at one pretrial colloquy, concerning second-chair defense counsel's familial relation to the State's case agent, Appellant said: "I understand the conflict of interest. If I feel that he has done something that is not negotiable I'm going to go *pro bono* [sic]. I'm going to represent myself." This statement clearly indicates that Appellant did not wish to represent himself at that time. Appellant also claims that he initially "resisted" counsel's intended strategy to acknowledge guilt, but later "capitulated." He points to the pretrial colloquy on this issue as proof of his dissatisfaction with counsel and his alleged continuing desire to proceed *pro se*. The record simply does not support this claim. Defense counsel announced to the court that he intended to "concede guilt" in *voir dire*. Appellant apparently understood this phrase to mean something akin to pleading guilty, and made it clear that he wanted the fact-finder to determine his guilt: "Let them do that." The trial court gave counsel additional time to confer with Appellant off the record. When the colloquy was resumed, Appellant, without reservation, concurred with counsel's decision to "acknowledge" guilt in *voir dire*.

¶ 20 At this point, the trial court asked Panelist A. whether or not he could keep an open mind about the concept of mental illness. Panelist A. responded: "I just think that maybe I don't know enough about it. And maybe that is why I don't believe so much into it. I mean, I don't know." The trial court continued; when Panelist A. was asked if he would be willing to keep an open mind about all the evidence, including mental illness, and not be predisposed about the subject, Panelist A. said that he would. Defense counsel subsequently asked that Panelist A. be removed for cause, but the trial court denied the request.

■■■ ¶ 21 The trial court has discretion in the manner and extent of questions asked in *voir dire. Brogie v. State*, 1985 OK CR 2, ¶ 25, 695 P.2d 538, 544. The court and counsel all agreed that inquiring about the panelists' personal experiences with mental illness was a delicate matter.[13] The court took pains to resume the colloquy with Panelist A. in a cordial manner, outside the presence of the rest of the jury panel. Appellant faults the trial court for not forcing Panelist A. to divulge more details of his personal experience with mental illness. We note that defense counsel never specifically asked the court to direct A. to answer any particular set of questions. Panelist A. did explain *how* his experiences with mental illness had affected him, and his responses appear quite candid.

■■■ ¶ 22 Still, Panelist A.'s reluctance to approach the matter more openly is disconcerting. All doubts regarding juror impartiality must be resolved in favor of the accused. We apply this rule to trial courts, and to our own analysis as well. *Hawkins v. State*, 1986 OK CR 58, ¶ 5, 717 P.2d 1156, 1158. Caution is never more important than in a capital case where doubt is cast on a prospective juror's ability to fairly consider all evidence relevant to punishment. Given Panelist A.'s reticence, in our view the trial court abused its discretion in not excusing him for cause. Nevertheless, Appellant has failed to demonstrate prejudice sufficient to warrant reversal or modification of sentence. After using one peremptory challenge to remove Panelist A., and exhausting the remainder of the challenges granted him under Oklahoma law, defense counsel requested an additional challenge to remove another panelist, which request was denied. Although this panelist was not challengeable for cause, defense counsel expressed concerns about her, because while recently employed at a restaurant, she had occasionally encountered police officers as patrons. However, these officers had no connection to this case, and the panelist assured the court that the brief acquaintances had no impact on her ability to serve as a juror. Appellant might have preferred not to have this panelist on the final panel, but he has not demonstrated that she, or anyone else who sat on his jury, was less than fair and impartial. *Ross v. State*, 1986 OK CR 49, ¶ 11, 717 P.2d 117, 120, *aff'd., Ross v. Oklahoma*, 487 U.S. 81, 86–88, 108 S.Ct. 2273, 2277–78, 101 L.Ed.2d 80 (1988); *Rojem*, 2006 OK CR 7 at ¶ 36, 130 P.3d at 295; *Harris v. State*, 2004 OK CR 1, ¶ 13, 84 P.3d 731, 741. Appellant's right to a fair trial, before an impartial jury, was not compromised. Proposition 3 is denied.

**B. The trial court's removal of Panelist I. for not being "death qualified."**

■■■ ¶ 23 In Proposition 4, Appellant claims the trial court committed error in excusing Panelist I. for cause. Panelist I. initially indicated that she could fairly consider all three punishment options. However,

---

13. Prior to trial, the State had moved *in limine* to restrict defense counsel's *voir dire* on certain issues, including mental illness, so as to avoid probing too deeply into the personal lives of the panelists. The trial court agreed such background information was usually inappropriate. The court indicated that inquiries about panelists' attitudes on mental illness, psychiatry, and the like would be proper so long as they were framed in general terms, but that "just a general discussion about Aunt Nilly's mental illness" would likely not be. Several times during *voir dire*, the prosecutor objected when she felt defense counsel crossed the line by asking questions on subjects that delved too deeply into panelists' personal lives. Defense counsel agreed to focus on the general question of whether there was anything in the panelist's background that would interfere with being a fair juror, and to leave it to the individual panelist whether or not to offer further details.

after defense counsel broached the subject of mental illness as a possible factor in the trial, Panelist I. retreated from her initial convictions. She asked to approach and discuss the matter outside the hearing of the other panelists. She explained that she had a brother who had recently been diagnosed with schizophrenia, and candidly admitted that evidence of similar illness on Appellant's part would bias her against imposition of the death penalty. The State moved to excuse Panelist I., and the trial court did, over defense objection.

¶ 24 In a capital case, a prospective juror may not be excused for cause simply because she voices philosophical or religious objections to the death penalty. *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The critical inquiry is whether, despite those personal beliefs, the panelist can follow the law given to her by the trial court. *Morgan v. Illinois*, 504 U.S. 719, 728, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992); *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *Wainwright v. Witt*, 469 U.S. 412, 420, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Whether to disqualify a prospective juror for cause is a matter of the trial court's discretion, and will not be disturbed unless an abuse of discretion is shown. *Bernay v. State*, 1999 OK CR 37, ¶ 10, 989 P.2d 998, 1005. Once again, we generally defer to the impressions of the trial court, who can better assess whether a potential juror would be unable to fulfill his or her oath. *Id.; see also Miller–El v. Cockrell*, 537 U.S. 322, 339, 123

S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003) ("Deference [on jury-selection issues] is necessary because a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court to make credibility determinations").

¶ 25 Appellant argues that it was unfair to excuse Panelist I. for admitting that she could consider what, in essence, would turn out to be an entirely proper mitigating circumstance that would justify a sentence other than death. Yet Panelist I.'s responses suggest that based on her experiences, a defendant's mental illness (specifically schizophrenia) might render her unable to consider the death penalty at all. When defense counsel asked Panelist I. if, assuming evidence of schizophrenia was presented, she could give both sides a fair trial, she replied: "I don't think that I would because I would be learning more—I would be more empathetic towards the person with the schizophrenia, since I have personal experience with it." When defense counsel attempted to rehabilitate the panelist, asking her if she could put aside her personal experiences and decide the case solely on the evidence presented, her answer was, "No, it would be too hard. . . ." Despite further attempts at rehabilitation by the defense, Panelist I. stood firm: "I have told you I don't think that I would be able to [consider the death penalty], if that is a factor, if that indeed is a factor." These answers support the trial court's conclusion that I. could not fairly consider all punishment options in this case.[14] The trial court did not abuse its discretion here.[15]

14. Citing *Morgan v. Illinois*, 504 U.S. 719, 728, 112 S.Ct. 2222, 2229, 119 L.Ed.2d 492 (1992), Appellant claims that the only two kinds of people whose views on capital punishment bar them from serving on a capital jury are those who would always impose the death penalty for murder, and those who would never do so. This is a distorted reading of the applicable law. Obviously, the bottom line is whether the panelist could follow the law in the particular case before them. A panelist's categorical support for, or aversion to, the death penalty certainly make the facts of the instant case irrelevant to their decision process. But there is another set of panelists who are also excusable for cause: those who, for whatever reason, would be unable to fairly consider all punishment options *as to the particular defendant in the case they have been summoned for*. Often, the panelists in this category

are only revealed as counsel begin to *voir dire* about specific kinds of evidence that is anticipated. We understand the delicate task attorneys have in *voir dire*—to probe panelists' biases about particular subjects, without crossing the line into hypothetical scenarios and asking them to "prejudge" the case. However, sometimes that search turns up more than counsel bargained for, and a sympathetic mind reveals itself to be a predisposed one.

15. Appellant also argues that the practical effect of erroneously excusing Panelist I. for cause was to give the State an additional peremptory challenge, and that because unrelated court documents indicate Panelist I. was African–American, the prosecutor was essentially allowed to "avoid justifying the use of a peremptory challenge with

*Jackson v. State,* 1998 OK CR 39, ¶¶ 19–21, 964 P.2d 875, 884–85. Proposition 4 is denied.

## C. The State's use of peremptory challenges to remove minority panelists.

¶ 26 In Proposition 5, Appellant claims the State violated *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), by using peremptory challenges to remove two African–American prospective jurors.[16] In *Batson,* the United States Supreme Court held that the use of peremptory challenges to exclude panelists from the jury based on their race violates the Equal Protection Clause of the United States Constitution. *Batson* establishes a three-part inquiry. First, the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race. Generally, he does this by simply objecting to the removal and pointing out the apparent race of the panelist. Once he does so, the burden shifts to the prosecutor to articulate a clear, reasonably specific, and race-neutral explanation for striking the panelist. That explanation need not be particularly persuasive; it must only be race-neutral, and will be deemed so unless a discriminatory intent is inherent in the answer. Once a facially race-neutral explanation is given, the opponent of the strike bears the burden of proving discriminatory intent. *Batson,* 476 U.S. at 96–98, 106 S.Ct. at 1723–24; *Purkett v. Elem,* 514 U.S. 765, 767–69, 115 S.Ct. 1769, 1771, 131 L.Ed.2d

834 (1995); *Harris,* 2004 OK CR 1, ¶ 19, 84 P.3d at 742–43. We review a trial court's *Batson* rulings for an abuse of discretion, since the trial court has the unique benefit of being able to personally assess the demeanor of the prosecutor making the challenge. *Bland v. State,* 2000 OK CR 11, ¶ 14, 4 P.3d 702, 711. The trial court is also in the best position to consider the demeanor of the panelist in question and the tenor of her responses, insofar as those factors may bear on the prosecutor's explanation for the strike. *Snyder v. Louisiana,* —— U.S. ——, 128 S.Ct. 1203, 1207–08, 170 L.Ed.2d 175 (2008).

¶ 27 Appellant's first complaint concerns Panelist E., an African–American woman. When asked to give a race-neutral explanation for removing E., the prosecutor gave two: first, that she had failed to disclose a misdemeanor charge filed against her in Oklahoma County; and second, that she said she would "have to pray and let God guide her" in deliberations. Appellant attempts to dismantle both justifications, but we need find only one of them facially race-neutral, and find the latter to be just that.[17] The prosecutor may well have felt that Panelist E. would be unwilling to follow the law as instructed to her by the trial court. In any event, the explanation is race-neutral on its face, and defense counsel offered no evidence to the contrary. We see no racial motivation in this peremptory strike.[18]

a race-neutral reason." As we find the trial court did not err in excusing this panelist for cause, we need not address this claim.

16. Appellant's first *Batson* objection was to the excusal of Panelist G. The prosecutor responded that despite her Hispanic surname, Panelist G. appeared to be Caucasian, and maintained that any claim of a "pattern" of race-based exclusion was, as yet, premature. Once the prosecutor struck the two African–American panelists at issue here, defense counsel never asked the trial court to revisit the strike of Panelist G., and Appellant does not complain about G.'s removal in this appeal.

17. Appellant faults the first explanation because the panelists were never specifically asked if they had ever been "charged" with a crime, only if they had ever "been in a court of law, under any circumstances, either as a witness, a plaintiff or

as a defendant". When the prosecutor revealed that Panelist E. had been charged with writing a bad check, the court discussed the matter with counsel and the panelist *in camera.* Apparently, Panelist E. took care of the matter at the court clerk's office. On appeal, the State claims this race-neutral reason was still plausible, since the prosecutor may have felt that E. had not been entirely forthcoming. During the *in camera* hearing, the court asked Panelist E. if she had anything to add on the "appearing in court" issue. She then offered another, much clearer incident of being "in court" that she had not previously disclosed: she had appeared in bankruptcy court less than a month before. Yet, only when the court specifically asked E. about the bogus check matter did she disclose it.

18. We reject Appellant's claim that the prosecutor's strike amounted to discrimination based on religious affiliation, and therefore have no occa-

¶ 28 Appellant's second complaint concerns Panelist J., also an African–American woman. When asked to give a race-neutral explanation for removing J., the prosecutor noted that she had expressed reluctance to view photographs of the victims' injuries. Appellant challenges this explanation, too, pointing out that several non-minority panelists who were not challenged by the State had expressed similar discomfort at having to consider photographs that were assured to be gruesome. However, racially-motivated discrimination is not established simply because panelists of different races provide similar responses, and one is excused while the other is not. *Smith v. State*, 2007 OK CR 16, ¶ 19, 157 P.3d 1155, 1164; *Black v. State*, 2001 OK CR 5, ¶ 32 & n. 10, 21 P.3d 1047, 1062 & n. 10. Rather, all the attendant circumstances are relevant to whether the strike was racially motivated. *Miller–El v. Dretke*, 545 U.S. 231, 240, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005). Appellant argues that statistical analysis—*e.g.* the percentage of minorities removed by the State from the panel—is relevant to whether racial discrimination was at work.[19] *See e.g. Snyder*, — U.S. at ——, 128 S.Ct. at 1207; *Miller–El*, 545 U.S. at 240–41, 125 S.Ct. at 2325. But statistical analysis does not advance Appellant's argument here. The State used only two of its nine peremptory challenges to remove minority panelists, and left more minorities on the panel than it removed.[20] The prosecutor's explanation for striking Panelist J. was sufficiently race-neutral. This proposition is denied.

### D. The trial court's decision to excuse a panelist for sleeping.

¶ 29 In Proposition 6, Appellant claims the trial court erred in excusing Panelist P. for sleeping during *voir dire*. The record indicates that the problem was brought to the court's attention by the prosecutor on the first day of *voir dire*. The trial court spoke with Panelist P. and admonished him of the importance of remaining alert. On the second day of *voir dire*, the court noticed that P. was sleeping again, and again discussed the matter with him. Over objection by the defense, the trial court granted the State's motion to excuse P. for cause.

¶ 30 Appellant notes that sleeping during *voir dire* is not specified among the bases for challenging a panelist for cause. *See* 22 O.S.2001, §§ 658, 659. However, § 658 of the Criminal Procedure Code allows excusal for any "defect in the faculties of the mind or organs of the body" that render the panelist "incapable of performing the duties of a juror." 22 O.S.2001, § 658(3). Furthermore, the trial court may excuse any panelist for any reason that "may render him, at the time, an unsuitable juror." 12 O.S.2001, § 572 (civil rules on jury formation); *see also* 22 O.S.2001, § 592 (incorporating civil rules on jury formation into Criminal Procedure Code). A trial court's decision to excuse a panelist due to factors which may bear on his competency to serve on the jury is reviewed for an abuse of discretion. *Blozy v. State*, 1976 OK CR 314, ¶ 11, 557 P.2d 451, 454.

¶ 31 Appellant describes the trial court's decision to excuse Panelist P. as "precipitous." But the trial court noticed the panelist to be sleeping on two consecutive days, and spoke with him each time, before deciding to excuse him. We defer to the trial court's observations and its conclusions based thereon. The trial court did not abuse its discretion in excusing Panelist P. for cause.[21] This proposition is denied.

sion to consider his argument that *Batson* and its progeny should extend thus.

19. The trial court commented that the racial makeup of the seated jury showed no pattern of discrimination. Appellant criticizes this reasoning, claiming that a "pattern" of discrimination is not essential to a *Batson* claim. Yet, Appellant's own analysis focuses on supposed patterns in the peremptory-challenge process, and on the racial makeup of the seated jury. If the motivation behind one strike is in doubt, the court "would be required to consider" other minority strikes, *i.e.*, whether a "pattern" is evident. *Snyder*, — U.S. at ——, 128 S.Ct. at 1208.

20. We also note that before Panelist J. was ever removed, the prosecutor indicated that she wished to waive her remaining three challenges; but under the trial court's method of jury selection, she was required to use all nine. The State used its last challenge to remove Panelist J.

21. Appellant characterizes the removal of Panelist P. as, in essence, giving the State a peremptory challenge it was not entitled to. Because P.

### E. The trial court's decision to replace a sitting juror with an alternate.

¶ 32 In Proposition 7, Appellant claims he was denied due process when the trial court replaced a sitting juror with an alternate. During the trial, Juror A. reported to the court several incidents that made her uncomfortable. She stated that one of the witnesses had approached her outside the courtroom, that spectators to the trial had "stared her down" near the courthouse elevators, and that yet another spectator had ridden on the elevator with her, attempted to converse with her, and blocked her exit from the elevator and made an oblique comment. Juror A. stated that two of these incidents were witnessed by another juror in her company, Juror R. The trial court also spoke with Juror R., whose accounts differed somewhat from those of Juror A. In essence, Juror R. did not feel that the actions of the spectators were meant to be intimidating in any way. After both jurors had been interviewed, the prosecutor asked that Juror A. be excused and replaced with one of the alternates, because Juror A.'s accounts of attempted jury tampering appeared to have been embellished. Defense counsel objected to A.'s removal, stating that she had done nothing wrong.

¶ 33 A trial judge has inherent authority to remove a sitting juror and substitute an alternate juror, when good cause is shown. *Miller v. State*, 2001 OK CR 17, ¶ 23, 29 P.3d 1077, 1082–83. The reasons for removing a sitting juror are not limited to illness or death, but include any circumstance which might impinge on the right to a fair and impartial jury. *See e.g. Washington v. State*, 1977 OK CR 240, ¶¶ 25–28, 568 P.2d 301, 308; *see also Boutcher v. State*, 4 Okl. Cr. 576, 111 P. 1006, 1008 (trial court has a duty to replace a sitting juror if, "for any reason," the court "even suspects" that the juror cannot be fair and impartial). This decision is left to the trial court's discretion, and will not be overturned unless an abuse of discretion is shown. *Miller*, 2001 OK CR 17, ¶ 24, 29 P.3d at 1083.

¶ 34 Appellant claims the trial court's removal of Juror A. was uncalled for, because she did nothing wrong and never claimed that these incidents affected her ability to serve. But a juror's reaction to outside forces, real or perceived, is a prime example of how her ability to be fair and impartial may be compromised without actual "misconduct" on her own part. *See Washington*, 1977 OK CR 240, ¶ 26, 568 P.2d at 308 (substitution made due to juror's need to attend funeral). As with so many issues involving jury selection and courtroom management, the trial court's ability to assess the demeanor of the parties involved is critical. The trial court is, in essence, the finder of fact in these situations.

¶ 35 Appellant suggests that he had a "right" to the original twelve persons seated on the jury. We cannot agree. As we have pointed out, "[t]he defendant has no vested right to have any particular juror on the panel selected to serve in his case. His right is that of refusal rather than that of selection." *Gregg v. State*, 69 Okl.Cr. 103, 121, 101 P.2d 289, 296 (1940). Appellant's argument presumes that alternate jurors, subjected to the same selection process (including peremptory challenges by the parties), are yet somehow inferior to the original panel. But the very purpose of selecting alternate jurors is to ensure that acceptable substitutes are available in case a contingency arises. As for Juror A.'s replacement, Appellant passed that alternate for cause, and even when he was seated on the jury, defense counsel had no complaint with his ability to serve. In removing Juror A., the trial court acted out of an abundance of caution to ensure a fair trial, and we fail to see how Appellant was prejudiced. *Miller*, 2001 OK CR 17, ¶ 29, 29 P.2d at 1083. This proposition is denied.[22]

---

was a minority, Appellant further complains that the State should have been required to give a race-neutral reason for asking that he be excused. Appellant made a similar argument with regard to a different panelist in Proposition 4. Because we find the trial court properly excused P. for cause, we need not address these arguments further.

22. Again, Appellant characterizes the trial court's action as, in essence, allowing the State an additional peremptory challenge. *See* foot-

## IV.

## DOUBLE JEOPARDY

¶ 36 In Proposition 8 Appellant claims, for the first time on appeal, that his two convictions for First Degree Robbery violate the constitutional guarantee against double jeopardy. U.S. Const.Amends. V, XIV; Okl. Const. Art. 2, § 21. The evidence showed that Appellant, at gunpoint, forced Suzette Smith to give him cash and checks from the hotel's drawer. A short time later, Appellant took personal belongings, including an ATM card, from Smith's purse. Appellant claims that because Smith was the "victim" of both robberies, and because both took place in a short span of time, only one robbery was committed. We disagree.

¶ 37 Appellant points out that robbery is a crime against the person, not against property. However, one person can be robbed twice by the same perpetrator in a short span of time. We addressed this same argument on somewhat similar facts in *Rogers v. State*, 1995 OK CR 8, ¶¶ 26–28, 890 P.2d 959, 972–73, and found two distinct acts of robbery committed against the same victim in a relatively brief period of time. In the case before us, Appellant admitted to taking the hotel's receipts from the front desk, then forcing Smith to another room, where he proceeded to take belongings from her purse and kill her. We find sufficient separation in time and space between the two takings to warrant separate convictions. *Salyer v. State*, 1988 OK CR 184, ¶¶ 14–16, 761 P.2d 890, 893–94.[23] This proposition is denied.

## V.

## PUNISHMENT–STAGE ISSUES

¶ 38 Appellant does not contest the sufficiency of the evidence to support the aggravating circumstances alleged by the State in support of the death penalty. The evidence presented in the guilt stage of trial (and incorporated into the punishment stage) supported the jury's finding (1) that Appellant's conduct during the crimes created a great risk of death to more than one person, and (2) that the murders were committed in order to avoid arrest or prosecution. In the punishment stage of the trial, the State presented additional evidence (3) that at the time of the murders, Appellant was serving a sentence of imprisonment for conviction of a felony;[24] (4) that Appellant posed a continuing threat to society;[25] and finally, (5) that

notes 15 and 21, regarding Propositions 4 and 6. Because our focus is on the record supporting the trial court's exercise of discretion, we decline to address this argument further. Appellant also claims that the unjustified removal of a sitting juror is a "structural error," for which no prejudice need be shown. With no controlling authority to support this argument, we reject it.

23. Appellant relies heavily on *Mansfield v. Champion*, 992 F.2d 1098 (10th Cir.1993). In *Mansfield*, the defendant robbed a liquor store clerk at gunpoint; he was convicted of two counts of robbery, one for property belonging to the store, and the other for property belonging to the clerk. In *Mansfield*, the Tenth Circuit Court of Appeals used its analysis of Oklahoma law to conclude that only one robbery had been established. We initially note that a federal court's interpretation of Oklahoma law is not binding on us. *State v. Tolle*, 1997 OK CR 52, ¶ 5, 945 P.2d 503, 504. Nevertheless, *Mansfield* is not at odds with our decision here. In reaching its decision, the Tenth Circuit in *Mansfield* repeatedly emphasized that there were not enough facts in the record to conclude that the takings occurred anything but simultaneously; in fact, that issue was apparently never raised. *See Mansfield*, 992 F.2d at 1101 & n. 5. Citing our decision in *Salyer*, the Court expressly recognized that a separation of time and place—even moving the victim from one room to another—can be sufficient to justify multiple convictions, even for the same type of crime. *Id*. This Court considered *Mansfield* and found it factually inapposite in *Rogers*.

24. At the time of the murders, Appellant was on parole from a felony conviction in Virginia. The State presented uncontested evidence of this fact in the punishment stage of the trial. The fact that Appellant was on parole is sufficient to meet the statutory requirement that the defendant be serving "a sentence of imprisonment." 21 O.S. 2001, § 701.12(6); *Patton v. State*, 1998 OK CR 66, ¶ 94, 973 P.2d 270, 297. Appellant does not argue otherwise.

25. To support the continuing-threat aggravator, the State presented evidence (1) that a few months before the murders, after Appellant's girlfriend Cheryl Tubbs was fired from her employment at the hotel, Appellant made threats to harm the staff of the hotel; (2) that after murdering Brenda McElyea, Appellant slashed her body with a box knife to ensure the weapon was sharp

the murder of Suzette Smith was especially heinous, atrocious, or cruel. Appellant also does not present any complaints about the victim-impact evidence presented in the punishment stage. Appellant's punishment-stage arguments focus on evidence, instructions, and prosecutorial comments which he believes unfairly influenced the jury's selection of the death penalty as the most appropriate punishment.

## A. Admissibility of writings purportedly authored by Appellant in jail.

¶ 39 In Proposition 9, Appellant claims that two writings purportedly authored by him were not properly authenticated. In the punishment stage of the trial, the prosecutor offered State's Exhibit 213, packet of approximately fifty handwritten requests, inquiries, and complaints to jail staff (most using a preprinted jail form), allegedly written by Appellant, to illustrate his ability to ' reason and communicate effectively—thereby rebutting the defense claim that Appellant had a diminished mental capacity which mitigated his culpability for the murders. Defense counsel did not object to the admission of the packet, so we review only for plain error.[26] *Simpson v. State,* 1994 OK CR 40, ¶ 2, 876 P.2d 690, 693.

¶ 40 The earliest two inmate requests appear to be dated before Appellant was apprehended and extradited to Oklahoma; in fact, one is dated several weeks before the murders were even committed. Appellant points out that the alleged author of these two documents is "Anthony Grant," while the rest are authored by "Donald Grant" or "Donald

Anthony Grant," and claims that an inmate named Anthony Wayne Grant was in the Oklahoma County Jail in mid–2001. The State responds that even if the first two writings were not authored by Appellant, any error in their admission was harmless, because approximately four dozen other writings in the same packet were, in fact, authored by Appellant.

¶ 41 The remaining jail inquiries show Appellant's ability to reason and express himself from September 2001 until October 2004. In some of them, Appellant continued his message on the back of the form or attached additional handwritten pages. (In contrast, the two writings Appellant complains of were brief inquiries, consisting of one or two sentences each.) Moreover, the jury had other, even more convincing documentary evidence of Appellant's mental abilities during the same period of time. Besides the inmate inquiries, the State introduced a half-dozen *pro se* pleadings that Appellant had filed in his case in 2003 and 2004. Perhaps most damaging to Appellant, however, was the nine-page letter he wrote in September 2005, explaining the motivation for the murders and giving the reader a moment-by-moment account of them. No graphic detail was spared. This letter, which Appellant admitted to authoring, is further evidence of his ability to plan and comprehend the nature and consequences of his conduct. In light of the substantial documentary evidence on this issue, we have no difficulty concluding that the two writings Appellant complains of did not contribute to the jury's punishment decision in any material way.[27] *Perry v. State,*

---

enough for his next victim; (3) that Appellant had engaged in an altercation with another inmate while awaiting trial; (4) that Appellant had commented to jailers how easy it would be for him to break their necks; and (5) that while in custody awaiting trial on these charges, Appellant obtained a handcuff key and secreted it in a tube of toothpaste.

26. Defense counsel had initial concerns about the authorship of at least one of the two writings, but did not renew his objection, even after the trial court gave him additional time to review the packet. *See* Proposition 16, regarding the claim of ineffective assistance of counsel.

27. Despite the brevity of these two writings, Appellant maintains that they were particularly

prejudicial because "they were written in close proximity to the crime and showed particularly clear thinking and goal-directed behavior [at the time of the murders]." Yet, the issue of Appellant's mental illness was not so compartmentalized. Appellant never interposed an insanity defense; evidence of his mental illness was reserved for the punishment stage. And while mental illness was certainly expressed as a mitigating circumstance, the formal list of mitigating factors presented by the defense did not restrict the issue of mental illness to the time that the crimes were committed ("Donald Grant has been diagnosed as schizophrenic; psychotic symptoms have been reported. Donald Grant has suffered from mental impairments since childhood"). Appellant's primary expert witness on this issue, Dr. Grundy, made it clear

1995 OK CR 20, ¶ 18, 893 P.2d 521, 526. This proposition is denied.

## B. Exclusion of certain exhibits proffered by the defense.

¶ 42 In Proposition 10, Appellant assigns error to the trial court's exclusion of Defense Exhibits 1 through 18. As previously discussed, Appellant underwent numerous psychological evaluations to determine his competency during the course of the prosecution. At trial, Appellant's chief expert witness, Dr. Grundy, testified extensively about his own evaluations of Appellant's mental health, as well as those of several other experts, which he duly considered as a normal part of his professional duties. Appellant sought to admit Defendant's Exhibits 1–8, which were reports Dr. Grundy had periodically drafted summarizing his evaluations, and Defendant's Exhibits 9–18, which were reports by various other mental health professionals who had examined Appellant.[28] After considerable research and discussion with counsel, the trial court excluded these exhibits—the first group as cumulative to Dr. Grundy's testimony, and the second group as hearsay. We review the trial court's rulings on admissibility of these reports for an abuse of discretion. *Ake v. State*, 1989 OK CR 30, ¶ 31, 778 P.2d 460, 467.

¶ 43 Section 2703 of the Evidence Code permits an expert witness to render an opinion based on information which may not itself be admissible, if such information is "of a type reasonably relied upon by experts in the particular field." 12 O.S.2001, § 2703; *see also Lewis v. State*, 1998 OK CR 24, ¶ 19, 970 P.2d 1158, 1166. This rule recognizes that in reaching their own opinions and conclusions,

experts typically and legitimately rely on the work of their colleagues, and on information gathered by others generally. Permitting experts to testify about such information, as it pertains to their own conclusions, avoids "the expenditure of substantial time in producing and examining various authenticating witnesses." Whinery, *Courtroom Guide to the Oklahoma Evidence Code* at 542.

¶ 44 Appellant does not contest the fact that Dr. Grundy was permitted to testify about the information contained in his own reports, as well as those of other mental health professionals. His only complaint is that the reports themselves should have been admitted as exhibits, for the jury's consideration during deliberations. Appellant cites several cases from this Court as authority for the proposition that mental-health evaluations should be considered "business records," and therefore excepted from the rule generally barring hearsay. 12 O.S.2001, § 2803(6). Appellant concedes that under the Evidence Code, even if a writing is admissible under some exception to the hearsay rule, it must still be sufficiently authenticated, *see* 12 O.S.2001, § 2901, and the cases he relies on reiterate this requirement.[29] The eight reports authored by Dr. Grundy were sufficiently authenticated, as Grundy himself testified about creating them. However, the ten reports not authored by Dr. Grundy were never authenticated.[30] For that reason, we need not decide whether they qualified as "business records."

¶ 45 Dr. Grundy's own reports were cumulative to his own testimony, and the trial court did not abuse its discretion in excluding them for that reason. 12 O.S.2001, § 2403; *Hancock v. State*, 2007 OK CR 9, ¶ 97, 155

---

that his task was to determine Appellant's competency to stand trial; Grundy did not attempt to evaluate Appellant's mental health at the time of the murders.

28. Defendant's Exhibit 5 was a duplicate copy of Defendant's Exhibit 1. Defendant's Exhibit 16 was a duplicate copy of Defendant's Exhibit 9.

29. *Moore v. State*, 1988 OK CR 176, ¶ 47, 761 P.2d 866, 874–75; *Perry*, 1995 OK CR 20, ¶ 18, 893 P.2d 521, 526; *Jones v. State*, 1983 OK CR 31, ¶¶ 34–35, 660 P.2d 634, 642–43; *Walker v. State*, 1992 OK CR 10, ¶ 13, 826 P.2d 1002, 1006.

30. Appellant counters that evidentiary rules on authentication arbitrarily deprived him of his constitutional right to present evidence. Yet there is no suggestion that Appellant was prevented from subpoenaing the experts in question to sponsor their own reports, or presenting any other type of evidence which might be sufficient to satisfy § 2901. *See Ake*, 1989 OK CR 30, ¶ 35, 778 P.2d at 468 ("While appellant claims the evidence [unsponsored mental-health reports] was crucial, we do not agree insofar as appellant could have called these various doctors to testify regarding their diagnoses and opinions").

P.3d 796, 818. By excluding the second group of reports, the trial court avoided placing undue emphasis on writings by authors who were never asked to come to court and testify about them. Many of these reports contain information and terminology which might be confusing to someone outside the world of psychology and psychiatry.[31] Liberal admission of such documents could turn trials into paper wars, and undermine the fundamental preference for live testimony subject to cross-examination. Further, admitting a stack of evaluations by non-testifying experts runs a serious risk of confusing the jury.[32] 12 O.S.2001, § 2403.

¶ 46 In the final analysis, we fail to see how Appellant was prejudiced by the trial court's decision. Because Dr. Grundy was able to testify about these reports, he gave a comprehensive summary of Appellant's mental functioning, from the defense point of view, but supported in many aspects by experts not aligned with the defense. *See Ake*, 1989 OK CR 30, ¶ 35, 778 P.2d at 468 (finding the probative value of excluded reports "diminished" because the defense expert was able to testify about them). The trial court

did not abuse its discretion in excluding these reports, and Appellant fails to demonstrate prejudice in any event. This proposition is denied..

## C. Instruction on the proper use of mitigation evidence.

¶ 47 In Proposition 11, Appellant claims that the trial court's instructions, coupled with the prosecutors' closing arguments, improperly limited the jury's consideration of evidence presented in mitigation of the death sentence. The trial court administered the standard instructions on the definition and use of mitigating evidence. *See* OUJI–CR (2nd) Nos. 4–78 and 4–79. Appellant concedes that we have found these instructions to be entirely proper. *See, e.g., Malone v. State*, 2007 OK CR 34, ¶ 87 & n. 167, 168 P.3d 185, 219 & n. 167. Nevertheless, Appellant maintains that the prosecutor focused on only part of the definition of mitigating evidence, and thus unfairly limited the jurors' consideration of the evidence Appellant had offered as mitigating. We recently rejected a similar argument. *Harris v. State*, 2007 OK CR 28, ¶ 27, 164 P.3d 1103, 1114.[33]

31. Unlike traditional "business records"—*e.g.*, routine entries of numbers or other information—and even other types of professional evaluations, assessments of mental health are subjective in nature and susceptible to constant revision based on additional information and interim treatment. In *Nauni v. State*, 1983 OK CR 136, ¶¶ 17–19, 670 P.2d 126, 131, we held that the trial court acted within its discretion in redacting a defendant's hospital records to remove psychiatric diagnoses made by non-testifying experts, noting that "[o]pinions and diagnoses of mental or psychiatric conditions have been generally considered too complex and speculative to be admitted without cross-examination." The reports and testimony at issue here provide several examples. Dr. Call's reports underscore his difficulty in determining whether, and to what degree, Appellant suffered from mental illness. Dr. Call ultimately agreed with Dr. Grundy that Appellant probably suffered from a form of schizophrenia, although the two disagreed on the particular type. In addition, Dr. Grundy initially found Appellant to be incompetent to stand trial, but later reversed his opinion after Appellant had undergone treatment. These considerations make the need for examination and cross-examination of such experts all the more important to understanding the meaning of their opinions.

32. The cases illustrate the danger of turning the trial into a game of documentary tit-for-tat. *See Jones*, 1983 OK CR 31, ¶ 31, 660 P.2d at 642 (without objection from the State, defense offered psychiatrist's letter finding defendant to be schizophrenic; but defense objected to State's subsequent offer of a contemporaneous letter from a different expert finding the defendant to be non-psychotic and predicting future anti-social conduct; neither expert testified); *Van White v. State*, 1988 OK CR 47, ¶ 10, 752 P.2d 814, 818–19 (trial court admitted several documents offered by the defense regarding the defendant's mental history and finding him incompetent to stand trial; when the State offered a subsequent report finding the defendant was competent to stand trial, the defense objected; "If the trial judge had failed to admit this letter, after having previously admitted the foregoing defense exhibits, the jury would have been misled to believe that the appellant had never been found competent to stand trial").

33. In *Harris*, we directed that the language of OUJI–CR (2nd) No. 4–78 here be revised, but in so doing, made it clear that we found no material fault with the previous language of the instruction. *Harris*, 2007 OK CR 28 at ¶ 27, 164 P.3d at 1114. *Malone* was decided after *Harris*, but involved the same pre-*Harris* version of the instruction that was used here.

¶ 48 The law properly describes what "mitigating evidence" means in the most general terms.[34] The jurors in this case were properly instructed that anything could be considered mitigating, and that they need not unanimously agree on what evidence might warrant a sentence other than death. Appellant claims the prosecutor misstated the law by telling the jurors that the evidence he had presented as "mitigating" did nothing to justify a sentence less than death. Appellant confuses what kind of information may be offered as mitigating evidence, with whether that information successfully serves its intended purpose. While there is no restriction whatsoever on what information might be considered mitigating, no juror is bound to accept it as such, and the State is free to try to persuade the jury to that end. The prosecutor's arguments did not misstate the law on this point. This proposition is denied.

### D. Admission of gruesome crime-scene photographs.

¶ 49 In Proposition 12, Appellant complains that photographs of the two victims' bodies, introduced in the punishment stage, were needlessly cumulative and unfairly prejudicial. Appellant complains about the number of photographs introduced, and the fact that some injuries appear in more than one photograph. We review the trial court's admission of this evidence for an abuse of discretion. *Hogan v. State*, 2006 OK CR 19, ¶ 67, 139 P.3d 907, 931.

¶ 50 The photographs of the victims introduced in the punishment stage were somewhat more gruesome than those introduced in the guilt stage. Images of the numerous cuts to McElyea's back were offered to show that Appellant posed a continuing threat to society; Appellant admitted that he wanted to test the knife's sharpness for his next intended victim (Smith). Images of Smith's numerous horrific injuries were offered to show that her murder was especially heinous, atrocious, or cruel. The photographs at issue were clearly relevant to support these specific aggravating circumstances. *Hogan*, 2006 OK CR 19 at ¶¶ 65–67, 139 P.3d at 931. The number of images offered was a direct consequence of the number of injuries inflicted, particularly upon Smith. Furthermore, the focus of each photograph is on a different injury or aspect of the injury; the fact that an injury is the focus of one exhibit, and also in the background of another, does not render the exhibits unfairly prejudicial. The trial court carefully considered each photograph offered, and several were withdrawn by the State.

¶ 51 Appellant also argues that the photographs were not properly authenticated. The medical examiner who testified at trial, Dr. Choi, was not the examiner who conducted the autopsy; thus, Appellant claims, Dr. Choi had no personal knowledge of whether the photographs accurately depicted the condition of the victims' bodies. Appellant did not object on these grounds at trial, and we reject the argument in any event. A photograph may be authenticated by any method sufficient to establish that it depicts what it purports to depict, including (1) comparison by the trier of fact with other evidence that has been authenticated, and (2) "[a]ppearance, content, substance, internal patterns or other distinctive characteristics taken in conjunction with circumstances." 12 O.S.2001, § 2901(A), (B)(3), (4). In this case, the autopsy photographs, and the injuries they depicted, were consistent with the photographs of the victims at the crime scene, with Appellant's admissions of what he did to the victims, and with the medical examiner's written report, which Appellant does not object to. The court did not abuse its discretion in admitting these photographs.[35] This proposition is denied.

---

34. The trial court's definition read, in part, as follows:

Mitigating circumstances are (1) circumstances that may extenuate or reduce the degree of moral culpability or blame, or (2) circumstances which in fairness, sympathy or mercy may lead you as jurors individually or collectively to decide against imposing the death penalty. The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case....

35. Appellant also claims that trial counsel was ineffective for failing to object to these photographs on grounds of inadequate notice. We

### E. Admission of pre-mortem photographs of the victims.

¶ 52 In Proposition 14, Appellant challenges the constitutionality of Oklahoma law allowing pre-mortem photographs of victims in murder trials, *see* 12 O.S.Supp.2003, § 2403, and claims that the pre-mortem photographs introduced in this case injected sympathy and emotion into the sentencing proceedings. The State offered a single pre-mortem photograph of each victim into evidence. Appellant specifically complains that the photograph of one victim was a wedding portrait from several years ago. Yet, while defense counsel generally objected to the admission of any pre-mortem photographs as "unduly inflammatory," he did not specifically object that a different photograph of one victim might be more appropriate. In any event, in a number of recent cases, we have upheld careful application of 12 O.S. § 2403 against claims that the statute unconstitutionally injects passion and unfair prejudice into the capital sentencing process. *See e.g. Marquez–Burrola v. State*, 2007 OK CR 14, ¶¶ 28–33, 157 P.3d 749, 759–761; *Coddington*, 2006 OK CR 34, ¶¶ 53–58, 142 P.3d at 452–53. We find no reason to depart from that position here, and conclude that neither photograph was so inappropriate as to have caused unfair prejudice. This proposition is denied.

### F. Ineffective assistance of counsel.

¶ 53 In Proposition 16, Appellant claims his trial counsel team performed deficiently, denying him his Sixth Amendment right to reasonably effective assistance of counsel. We begin with the legal framework for evaluating ineffective-counsel claims. Appellant must demonstrate that trial counsel's performance was so deficient as to have rendered Appellant, in essence, without counsel. We assess counsel's performance for reasonableness in light of prevailing professional norms. Appellant must also demonstrate that the allegedly deficient performance caused prejudice; there must be a reasonable probability that the actions

in question undermine confidence in the outcome of the proceedings. We begin with the presumption that counsel's conduct was reasonable, and we accord great deference to questions of trial strategy, recognizing that there are many ways to handle any given case, and that counsel must make many strategic decisions along the way. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *Browning,* 2006 OK CR 8, ¶ 14, 134 P.3d 816 at 830–31.

¶ 54 Appellant's first complaint involves the autopsy photographs introduced in the punishment stage of the trial (see discussion of Proposition 12). Appellant claims that the State failed to give notice of its intent to use these photographs to support certain aggravating circumstances. The State responds that notice was in fact given, as the prosecutor filed several proposed exhibit lists which included these particular photographs. Oklahoma law prohibits the State from offering evidence in support of the death penalty without giving the defense an opportunity to review it before trial. "Only such evidence in aggravation as the State has made known to the defendant prior to his trial shall be admissible." 21 O.S.2001, § 701.10(C). Appellant implies that the State was required to specifically state which exhibits would be reserved for the punishment stage, and which specific aggravating circumstances they would be used to support. The law is simply not that demanding. Incorporation of all guilt-stage evidence into the punishment stage of a capital trial is a universal practice.[36] Appellant has offered no citation to the record, or affidavit from trial counsel, suggesting that counsel was unfairly surprised by these photographs or their specific purposes. We cannot conclude trial counsel was deficient when there is no factual or legal basis to support that claim.

¶ 55 Next, Appellant faults trial counsel for not more closely examining State's Exhibit 213, the packet of inmate requests discussed in Proposition 9. Had counsel done so, Appellant claims, he would have realized that two

---

address this argument in our discussion of Proposition 16.

**36.** The photographs at issue were, in fact, identified by the Medical Examiner in the guilt stage, but were not offered into evidence until the punishment stage.

of the requests were authored by someone other than Appellant. In our discussion of Proposition 9, we found that any error in admitting these two documents was harmless, given their lack of substance, and considering the four dozen documents in the packet which were, in fact, authored by Appellant. Because we do not believe these two documents were in any way outcome-determinative, we cannot find trial counsel ineffective for failing to seek their exclusion. *Littlejohn v. State*, 2008 OK CR 12, ¶ 27, 181 P.3d 736, 745; *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

¶ 56 Appellant also claims trial counsel was ineffective for failing to object to most of the prosecutors' comments complained of in Proposition 13. Although we discuss those comments in more detail below, for purposes here, we conclude that none of these comments were so improper that any objections to them would rightfully have been sustained. *Pavatt v. State*, 2007 OK CR 19, ¶ 66, 159 P.3d 272, 292.

¶ 57 Appellant's last two complaints involve trial counsel's failure to investigate aspects of his mental health. As for Appellant's claim that trial counsel did not adequately monitor his competency to stand trial, we discussed and rejected that assertion in Proposition 1. The final complaint is defense counsel's failure to call several witnesses who could have testified about Appellant's mental illness. Appellant submits three affidavits from friends or family which discuss his disadvantaged childhood, and offer occasional examples of his strange behavior in the years preceding the instant crimes. Appellant also submits two affidavits from jail personnel who attest to his mental problems while awaiting trial. Appellant also includes a report by a neuropsychologist, linking some of Appellant's mental deficits to an organic brain disorder, and concluding that these deficits appeared very early in Appellant's life. As we noted in Proposition 1, these extra-record materials were presented, contemporaneously with Appellant's brief, in conjunction with a claim of ineffective assis-

tance of counsel. *See* Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, 22 O.S., Ch. 18, App. (2009).

¶ 58 Because the evidence of Appellant's guilt was overwhelming, defense counsel focused on punishment. Most of the aggravating circumstances were self-evident from the first-stage evidence. Counsel's strategy was to present expert evidence on Appellant's mental illness, and testimony from family members about his disadvantaged and dysfunctional childhood. These mitigation strategies were by no means antagonistic. In fact, jurors might have found the circumstances surrounding Appellant's formative years to have created, or at least aggravated, his mental problems. But defense counsel spent considerable time presenting such evidence to the jury. And while the presence or absence of organic brain disorder might have shed light on one potential cause of Appellant's mental illness, the fact that Appellant had some sort of mental illness was never in serious dispute. In our view, the affidavits Appellant submits on appeal do not present anything qualitatively different from what was presented at trial on these issues.[37] We find no reasonable probability that these additional witnesses would have affected the jury's sentencing decision. *Wood v. State*, 2007 OK CR 17, ¶ 44, 158 P.3d 467, 481. In summary, Appellant has not overcome the strong presumption that his trial counsel performed competently. This proposition is denied.

### G. Propriety of executing the mentally ill.

¶ 59 In Proposition 15, Appellant claims that application of the death penalty to mentally ill defendants constitutes cruel and unusual punishment, and argues that his own mental illness should, as a matter of law, exempt him from the death penalty. Appellant urges this Court to exempt the mentally ill from capital sentencing, much as juveniles and the mentally retarded are. Appellant offers no authority for this proposal. To be

---

37. Appellant also submits the affidavit of one of the jurors that sentenced him, stating that Appellant appeared to her to be like a "zombie" during the trial, rarely speaking to his attorneys. This

observation may have been relevant to the juror's fact-finding task at trial, but it is of marginal value in determining whether Appellant was competent.

sure, the execution of a convict "whose mental illness prevents him from comprehending the reasons for the penalty or its implications" constitutes cruel and unusual punishment. *Ford v. Wainwright,* 477 U.S. 399, 417, 106 S.Ct. 2595, 2605, 91 L.Ed.2d 335 (1986). But Appellant has not demonstrated that any mental problems have impaired him to that degree.

¶ 60 Appellant repeatedly argues that he was mentally ill at the time he murdered Brenda McElyea and Suzette Smith. However, that issue has never been properly litigated. Appellant did not raise an insanity defense or otherwise argue that he suffered from impaired mental functioning at the time of the offenses. The focus of the mental-health evidence in this prosecution was on Appellant's competency to stand trial, which even the defense's chief expert, Dr. Grundy, indicated was an entirely separate inquiry that he was not asked to conduct. Thus, even if we were to entertain the policy arguments cited by Appellant, we are unable to apply them to Appellant on the record before us.[38]

¶ 61 Appellant was free to present evidence of mental illness to the jury as a mitigating circumstance, and he did so. The jury apparently found that whatever mental illness Appellant might have, it did not mitigate his moral. culpability or blame. Despite evidence that Appellant suffers from some sort of mental illness, "we accept the jury's conclusion that Appellant harbored a culpability deserving of the death penalty." *Lockett v. State,* 2002 OK CR 30, ¶ 42, 53 P.3d 418, 431. This proposition is denied.

**H. Arbitrary and emotion-driven application of the death penalty; cumulative error; mandatory sentence review.**

¶ 62 In Proposition 13, Appellant claims the jury's imposition of the death penalty in this case was driven by passion and other improper factors. This argument combines the same complaints made in several other propositions, and adds some additional complaints of prosecutor misconduct. In Proposition 17, he claims that all errors previously identified worked cumulatively to deny him a fair sentencing proceeding. We combine our discussion of these cumulative-error claims with our mandatory sentence review. Under Oklahoma law, this Court is required to conduct review of any death sentence to determine (1) whether the evidence supports the sentencer's finding of aggravating circumstances, and (2) whether, despite any aggravating circumstances, the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary (and therefore improper) factor. 21 O.S.2001, § 701.13.

¶ 63 We have found no error in the evidence, instructions, or argument complained of separately in other propositions, and need not reiterate Appellant's specific concerns about them here. We have considered the remaining claims of prosecutor misconduct and find them to be without merit. Appellant claims that by waiting until closing argument to present the photographs of the victims, and Appellant's confession letter to the jury, the prosecutors deliberately sought a "visceral" response in sentencing. Yet all of this evidence was properly admitted in the punishment stage, and Appellant appears to concede its relevance. We find nothing improper here.

¶ 64 Appellant next claims that in punishment-stage closing arguments, the prosecutors misrepresented the evidence, offered their own opinions, and asked the jury to consider extraneous information. We disagree. Appellant has combed through the closing arguments and taken exception to several statements therein. A statement is not misleading simply because it is the view taken by the adverse party. The prosecutors' comments were not grossly misleading; they were fair comments on the evidence

---

**38.** For example, Appellant refers to a proposal by the American Bar Association's Individual Rights and Responsibilities Section, made in 2003, that a defendant should not be sentenced to death if, *at the time of the offense,* he had a severe mental disorder or disability that significantly impaired his capacity (a) to appreciate the nature, consequences or wrongfulness of his conduct, (b) to exercise rational judgment in relation to conduct, or (c) to conform his conduct to the requirements of the law. This position requires not just "mental illness"—which is still an elusive and mutable diagnosis—but mental illness to a degree that affects perception, volition, or judgment.

presented. *Lafevers v. State,* 1991 OK CR 97, ¶¶ 37–40, 819 P.2d 1362, 1370–71. The prosecutor's description of the crime scene as "an incredibly bloody hideous evil scene" was also a fair comment on the evidence. The prosecutor's statement, "I suspect Brenda McElyea knew that . . . he was going to kill her" was not objected to by defense counsel, and we find no plain error in it. *DeLozier v. State,* 1998 OK CR 76, ¶¶ 29–30, 991 P.2d 22, 28–29. Finally, Appellant complains (for the first time on appeal) that a definition of "justice," supposedly taken from a dictionary and read by the prosecutor in closing argument, was improper. The prosecutor said, "When you look up the word 'justice' in the dictionary here is how it's defined: 'To render unto each man that which he has earned.'" Appellant complains that he has found no dictionary which includes that precise wording. This argument is meritless. Whatever the source of the definition, it was within the bounds of proper argument. *See Hogan,* 2006 OK CR 19, ¶¶ 89–90, 139 P.3d at 935–36; *Lafevers,* 1991 OK CR 97, ¶ 39, 819 P.2d at 1370–71.

¶ 65 The prosecutors' comments summarized the evidence, summarized the applicable law, and argued why the State believed that the death penalty was appropriate in this case. We find no error here. Propositions 13 and 17 are denied. We have reviewed the entire record and find no evidence that the jury's imposition of the death penalty was the product of any improper factor. The sentences imposed by the jury are therefore **AFFIRMED.**

## DECISION

¶ 66 The Judgment and Sentence of the district court is **AFFIRMED.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2009), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

A. JOHNSON, V.P.J., LUMPKIN, P.J. and LEWIS, J.: concur.

CHAPEL, J.: dissents.

CHAPEL, J., Dissenting.

¶ 1 I agree with the majority that Panelist A should have been excused for cause after refusing to answer questions on the issue of mental illness. I cannot agree that this error requires no relief. In a capital case, one juror can mean the difference between life and death. Because Panelist A was not excused for cause, Grant had to use a peremptory challenge he would have used against another juror. In consequence, Grant was unfairly denied a peremptory challenge. According to our case law, the case must be reversed.

¶ 2 In *Golden v. State,* this Court held that a peremptory challenge is a structural component of the trial; denial of a preemptory challenge is not subject to harmless error analysis, prejudice is presumed, and the error warrants reversal.[1] In concluding in Grant's case that no relief is required, the Court not only disregards, but violates this precedent. The majority concludes that Grant has not shown that the jury which heard his case was less than fair and impartial. There is no legitimate basis for this conclusion in this case. The majority relies on *Ross v. Oklahoma.*[2] In *Ross,* a defendant used a peremptory challenge on a panelist who should have been excused for cause, but neither asked for extra peremptory challenges nor named any sitting juror he would have excused. A narrow majority of the United States Supreme Court held that, under these circumstances, appellate review focuses on whether the jury which heard the case was fair and impartial. The *Ross* opinion emphasizes that Ross does not claim any sitting juror was or could have been unfair or partial.[3] This test in *Ross* simply does not apply to cases such as Grant's. As the majority acknowledges, Oklahoma requires a defendant to preserve a claim that a juror

**1.** *Golden v. State,* 2006 OK CR 2, 127 P.3d 1150, 1154–55, *cert. denied, Oklahoma v. Golden,* 548 U.S. 906, 126 S.Ct. 2971, 165 L.Ed.2d 954 (2006). Three members of the majority concurred in this Opinion.

**2.** 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).

**3.** 487 U.S. at 86, 108 S.Ct. at 2277.

should have been excused for cause by naming, at trial, an unacceptable sitting juror he would have excused with another peremptory challenge.[4] As this was not an issue in *Ross*, the Supreme Court never discussed in any way the appropriate standard of review where a defendant named a sitting juror he would have excused, and thus alleged that his jury was not fair and impartial.

¶ 3 I note that in reaching its conclusion the majority independently, and improperly, reviews the record concerning the juror on whom Grant would have used the lost peremptory, determining that Grant has not shown she was less than fair or impartial. This procedure misstates our law preserving denial of a peremptory challenge for review.[5] Worse, it puts a burden of proof on Grant which is inappropriate for a claim in which no showing of prejudice is required.

¶ 4 Grant preserved this issue for review. After examining the record, the Court found that Panelist A should have been excused for cause. Grant claims he was denied a peremptory challenge. The Court agrees. Under *Golden*, this finding requires reversal. Given our holding in *Golden*, the majority's conclusion that his sitting jury was fair and impartial is simply irrelevant.

¶ 5 I also disagree with the majority's analysis of Proposition XI. The language of the uniform instruction defining mitigating evidence has been amended since Grant's trial. The majority states that, in *Harris v. State*,[6] we rejected the argument that the instruction and the prosecutor's argument were misleading and unfairly limited the jury's consideration of mitigating evidence. On the contrary, *Harris* found that the instruction, combined with a strikingly similar argument from the prosecutor, encouraged jurors to disregard evidence which was clearly appropriate in mitigation and unfairly limited jurors' consideration of mitigating evidence. This prompted the Court to request a clarifying amendment to the instruction. While the previous language is not in itself erroneous, and this error standing alone would not require relief, I must say that, following *Harris*, the combination of the instruction and argument here were error.

---

4. *See, e.g., Browning v. State*, 2006 OK CR 8, 134 P.3d 816, 830; *Warner v. State*, 2001 OK CR 11, 29 P.3d 569, 574.

5. I state above the procedure for preserving this issue for review. Where this purely procedural requirement is followed, as it was here, the issue is preserved. Further substantive analysis of the "unacceptable" juror by this Court is both un-

necessary and inappropriate. *See Jones v. State*, 2009 OK CR 1, 201 P.3d 869 (Chapel, J., dissenting).

6. 2007 OK CR 28, 164 P.3d 1103, 1114, *cert. denied,* —— U.S. ——, 128 S.Ct. 1717, 170 L.Ed.2d 524 (2008).